ELLIOTT ASSOCIATES, L.P., a Delaware Limited Partnership, Plaintiff Below, Appellant,

v.

AVATEX CORPORATION, a Delaware corporation, Xetava Corporation, a Delaware corporation, Abbey J. Butler, Melvyn J. Estrin, Hyman H. Frankel, Fred S. Katz, Charles C. Pecarro, William A. Lemer, and John L. Wineapple, Defendants Below, Appellees,

HARBOR FINANCE PARTNERS, LTD. and Anvil Investment Partners, L.P., Plaintiffs Below, Appellants,

v.

Abbey J. BUTLER, Melvyn J. Estrin, Hyman H. Frankel, Fred S. Katz, Charles C. Pecarro, William A. Lemer, John L. Wineapple and Avatex Corporation, Defendants Below, Appellees.

Nos. 279, 1998, 282, 1998.

Supreme Court of Delaware.

Submitted: July 21, 1998.
Decided: Aug. 28, 1998.

David C. McBride (argued), Bruce L. Silverstein, and James P. Hughes, Jr., of Young, Conaway, Stargatt & Taylor, Wilmington, for appellant Elliott Associates, L.P.

Norman M. Monhait, of Rosenthal, Monhait, Gross & Goddess, Wilmington, and J. Frederick William Gerkens III, of Wechsler, Harwood, Halebian & Feffer, New York City, for appellants Harbor Finance Partners, Ltd. and Anvil Investment Partners, L.P.

Kevin G. Abrams (argued), Thomas A. Beck, Holly June Stiefel, and Thad J. Bracegirdle, of Richards, Layton & Finger, Wilmington, for appellees.

Before VEASEY, C.J., and WALSH, HOLLLAND, HARTNETT and BERGER, JJ., constituting the Court en Banc.

VEASEY, Chief Justice:

In this case of first impression, we hold that certain preferred stockholders have the right to a class vote in a merger where: (1) the certificate of incorporation expressly provides such a right in the event of any "amendment, alteration or repeal, whether by merger, consolidation or otherwise" of any of the provisions of the certificate of incorporation; (2) the certificate of incorporation that provides protections for the preferred stock is nullified and thereby repealed by the merger; and (3) the result of the transaction would materially and adversely affect the rights, preferences, privileges or voting power of those preferred stockholders. In so holding, we distinguish prior Delaware precedent narrowly because of the inclusion by the drafters of the phrase, "whether by merger, consolidation or otherwise."

### Facts

Defendant Avatex Corporation ("Avatex") is a Delaware corporation that has outstanding both common and preferred stock. The latter includes two distinct series of outstanding preferred stock: "First Series Preferred" and "Series A Preferred."[1] Plaintiffs in these consolidated cases are all preferred stockholders of defendant Avatex. The individual defendants are all members of the Avatex board of directors.

Avatex created and incorporated Xetava Corporation ("Xetava") as its wholly-owned subsidiary on April 13, 1998, and the following day announced its intention to merge with and into Xetava. Under the terms of the proposed merger, Xetava is to be the surviving corporation. Once the transaction is consummated, Xetava will immediately change its name to Avatex Corporation. The proposed merger would cause a conversion of the preferred stock of Avatex into common stock of Xetava.[2] The merger will effectively eliminate Avatex' certificate of incorporation, which includes the certificate of designations creating the Avatex preferred stock and setting forth its rights and preferences.[3] The terms of the merger do not call

---

1. Plaintiffs concede that the rights of the Series A Preferred are not implicated in this appeal.

2. On June 5, 1998, Avatex announced that it would delay execution of the proposed merger while it examined the conversion ratio originally contemplated. In its representations to this Court, Avatex has stated that it will not conduct a vote of the common stockholders until August 17, 1998, at the earliest, and that it is not likely to move forward with the transaction until this Court rules on plaintiffs' voting-rights claim. In fact, counsel for defendants represented to this Court that "Avatex is continuing to move forward with the merger and we expect to get a *prompt decision from [the Supreme Court]* that would give us some guidance as to the structuring of this particular transaction, or lead us to reconsider possibly some other transaction, de-

pending on the outcome of this ruling." These representations potentially raise the specter of an advisory opinion. *See Stroud v. Milliken Enter., Inc.*, Del. Supr., 552 A.2d 476 (1989) (issue not yet ripe where operative facts found only in litigant's letter to trial court seeking reaction of opposing counsel and court to proposed transaction). We are comfortable, however, that the issue before us is ripe for adjudication. The Avatex board has publicly stated its intention to pursue the merger, and has filed preliminary proxy materials with the SEC to that effect.

3. When certificates of designations become effective, they constitute amendments to the certificate of incorporation so that the rights of preferred stockholders become part of the certificate of incorporation. Accordingly, we will use the term "certificate" to refer to the certificate of

for a class vote of these preferred stockholders. Herein lies the heart of the legal issue presented in this case.

■ Plaintiffs filed suit in the Court of Chancery to enjoin the proposed merger, arguing, among other things, that the transaction required the consent of two-thirds of the holders of the First Series Preferred stock. Defendants responded with a motion for judgment on the pleadings, which the Court of Chancery granted, finding that the provisions governing the rights of the First Series Preferred stockholders *do not require* such consent.[4]

The plaintiffs allege that, because of Avatex' anemic financial state, "all the value of Avatex is [currently] in the preferred stock."[5] By forcing the conversion of the preferred shares into common stock of the surviving corporation, however, the merger would place current preferred stockholders of Avatex on an even footing with its common stockholders. In fact, the Avatex preferred stockholders will receive in exchange for their preferred stock approximately 73 % of Xetava common stock, and the common stockholders of Avatex will receive approximately 27% of the common stock of Xetava.

Under the terms of the Avatex certificate of incorporation, First Series stockholders have no right to vote except on:

(a) any "amendment, alteration or repeal" of the certificate of incorporation

"whether by merger, consolidation or otherwise," that

(b) "materially and adversely" affects the rights of the First Series stockholders.

The text of the terms governing the voting rights of the First Series Preferred Stock is set forth in the certificate of designations as follows:

> Except as expressly provided hereinafter in this Section (6) or as otherwise ... required by law, the First Series Preferred Stock shall have no voting rights.
>
> ...
>
> So long as any shares of First Series Preferred Stock remain outstanding, the *consent* of the holders of at least two-thirds of the shares of the *First Series Preferred Stock* outstanding at the time (voting separately as a class ... ) ... *shall be necessary to permit, effect or validate* any one or more of the following:
>
> ...
>
> (b) *The amendment, alteration or repeal, whether by merger, consolidation or otherwise, of any of the provisions of the* Restated *Certificate* of Incorporation or of [the certificate of designations] which would *materially and adversely affect any right, preference, privilege or voting power of the First Series Preferred Stock* or of the holders thereof. ...[6]

designations as integrated into the certificate of incorporation. *See Kaiser Aluminum Corp. v. Matheson,* Del.Supr., 681 A.2d 392, 394 n. 3 (1996) (citing 8 *Del. C.* §§ 102(a)(4), 151(g)).

**4.** The decision of the Court of Chancery in this consolidated proceeding dismissed portions of two separate complaints, one filed by Elliot Associates, L.P. as an individual suit (the "Elliott Complaint"), the other by Harbor Finance Partners Ltd. and Anvil Investment Partners, L.P. as an individual and purported class action (the "Harbor Complaint"). Both complaints allege that the Avatex First Series Preferred stockholders have a right to a class vote on the proposed transaction. The complaints contain other allegations that are not before us. *Harbor Fin. Partners Ltd. v. Butler,* Del. Ch., C.A. Nos. 16334 and 16336, 1998 WL 294011 (consolidated) (June 3, 1998) (Mem.Op.) [hereinafter *Mem. Op.* ]. The Court certified its ruling as a final judgment under Court of Chancery Rule 54(b). *Harbor Fin. Partners Ltd. v. Butler,* Del.Ch., C.A. Nos.

16334 and 16336 (consolidated) (June 16, 1998) (ORDER). The matter was decided by the Court of Chancery on defendants' motion for judgment on the pleadings under Court of Chancery Rule 12(c). Accordingly, we look only to those portions of the complaint to which the motion was addressed. The allegations therein must be assumed to be true for purposes of the motion. *Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund, II, L.P.,* Del.Supr., 624 A.2d 1199, 1205 (1993).

**5.** Elliott Complaint ¶ 22.

**6.** In addition, Section 4 of the Avatex certificate of incorporation provides, in relevant part:

> So long as any of the preferred stock remains outstanding, the consent of the holders of at least a majority of all outstanding shares of preferred stock ... shall be necessary for effecting or validating any amendment, altera-

These are the operative terms of Section 6 of the certificate of designations (with emphasis supplied) setting forth the rights and preferences of the First Series Preferred stock that became effective March 18, 1983 On September 14, 1983 a new certificate of designations became effective with respect to the Second Series Preferred stock. There is, however, no Second Series Preferred stock outstanding. Unlike the First Series certificate, Section 6 of the Second Series certificate expressly provides the Second Series Preferred stock with a right to vote on any consolidation or merger (with certain exceptions not relevant here) to which Avatex is a party:

> So long as any shares of the Second Series Preferred Stock remain outstanding, the consent of the holders of at least a majority of the shares of the Second Series Preferred Stock outstanding at the time ... shall be necessary to permit or approve any of the following:
>
> . . .
>
> (b) The consolidation or merger of the Corporation with or into any other corporation unless. . . .

We discuss this provision further in our analysis of the legal issue involved.

tion or repeal of any of the provisions of this Article [*including certain board resolutions*] which increase or decrease the par value of the preferred stock or would adversely affect the rights or preferences of the preferred stock, or of the holders thereof. . . .

*See also* 8 *Del.C.* § 242(b)(2) (providing by statute a class vote in certain circumstances). When an amendment to a certificate of incorporation is sought to be effected *under that section:*

> The holders of the outstanding shares of a class shall be entitled to vote as a class upon a proposed amendment, whether or not entitled to vote thereon by the certificate of incorporation, if the amendment would *increase or decrease* the aggregate number of authorized shares of such class, increase or decrease the par value of the shares of such class, or *alter or change* the powers, preferences, or special rights of the shares of such class so as to affect them adversely.

*Id.* Because the merger here implicates a different statute (8 *Del.C.* § 251, which does not itself require a class vote), the provisions of Section 242 are not implicated, the two statutes being of independent legal significance. *See Warner Communications Inc. v. Chris–Craft Indus., Inc.,* Del. Ch., 583 A.2d 962, 970, *aff'd*, Del.Supr., 567 A.2d 419 (1989). Likewise, Section 4 of the Avatex

## Issues That Are Not Before Us

Before proceeding further, we note preliminarily the allegations of the complaints that are *not* before us because they were not included in defendants' narrowly targeted motion for judgment on the pleadings. Those are the allegations claiming breach of fiduciary duty and entrenchment, as set forth in the Elliott Complaint,[7] and breach of implied covenant of good faith and anticipatory breach of contract, as set forth in the Harbor Finance Complaint.[8] Accordingly, we do not consider any claims or potential claims involving these issues or possible contentions of unfairness or inequitable conduct.[9] We consider only the terms of the preferred stock, the statutory framework and the purely legal issue decided by the Court of Chancery.

## Analysis

Delaware law permits corporations to create and issue stock that carries no voting power.[10] Professor Buxbaum, in his seminal article on preferred stock nearly 45 years ago, noted, among many other cogent observations, that: (a) statutes often permit alteration of preferred stock rights and preferences by merger;[11] (b) the merger may be

certificate is not applicable. Similarly, the Avatex Series A Preferred stock, which is not implicated in this appeal, has the right to a two—thirds class vote if the corporation seeks to "amend, alter, repeal or waive" any provision of the certificate of incorporation. But the additional language of the First Series Preferred, "whether by merger, consolidation or otherwise," significantly is missing from the rights granted to the Series A Preferred.

7. *See* Counts II and III of the Elliott Complaint.

8. *See* Counts I, III and IV of the Harbor Finance Complaint.

9. We express no view on the application of *Schnell v. Chris–Craft Indus., Inc.,* Del.Supr., 285 A.2d 437, 439 (1971) (ruling that bylaw amendment may not be undertaken inequitably even if legally permissible).

10. *See* 8 *Del.C.* § 151(a).

11. Richard M. Buxbaum, *Preferred Stock—Law and Draftsmanship,* 42 Cal.L.Rev. 243, 303 (1954).

with a "paper subsidiary created for that purpose with no independent business validity";[12] (c) "corporate articles [often] require consent of two-thirds (or a majority) of the preferred shareholders as a class for the consummation of any merger...";[13] and (d) courts have struggled with "controls in the name ... of 'fairness' and generally abandoned them [, which] is as it should be [since the] issue is one of corporate power."[14]

The Avatex certificate of incorporation provides that Avatex preferred shares have no right to vote except on matters set forth therein or required by law.[15] This denial of the right to vote is subject to an exception carved out for any "amendment, alteration or repeal" of the certificate "whether by merger, consolidation or otherwise" that "materially and adversely" affects the rights of the preferred stockholders. Such an event requires the consent of two-thirds of the First Series Preferred stockholders voting as a class.

 This appeal, then, reduces to a narrow legal question: whether the "amendment, alteration or repeal" of the certificate of incorporation is caused "by merger, consolidation or otherwise" thereby requiring a two-thirds class vote of the First Series Preferred stockholders, it being assumed for purposes of this appeal that their rights would be "materially and adversely" affected. The Court of Chancery answered this question in the negative. Although we respect that Court's craftsmanlike analysis, we are constrained to disagree with its conclusion.

Relying primarily on *Warner Communications Inc. v. Chris–Craft Industries Inc.*,[16] the Court of Chancery held that it was only the *conversion* of the stock as a result of the merger, and not the *amendment, alteration or repeal* of the certificate, that would adversely affect the preferred stockholders.[17] It is important to keep in mind, however, that the terms of the preferred stock in *Warner* were significantly different from those present here, because in *Warner* the phrase "whether by merger, consolidation or otherwise" was not included. The issue here, therefore, is whether the presence of this additional phrase in the Avatex certificate is an outcome-determinative distinction from *Warner*.

In *Warner*, the question was whether the Series B preferred stock of Warner Communications, Inc. had the right to a class vote on a proposed merger of Warner with Time, Inc. (renamed Time Warner Inc.) and TW Sub, its wholly-owned subsidiary. As the first step in a two-step transaction, Time had acquired approximately 50% of Warner's common stock in a tender offer. The second step was the "back-end" merger in which TW Sub was merged into Warner, which survived as a wholly-owned subsidiary of Time. The Warner common stock not held by Time was converted into cash, securities and other property. In the merger, the Warner Series B preferred would be converted into Time Series BB preferred stock. The parties stipulated that the Warner Series B stockholders would thereby be adversely affected.[18]

The Chancellor held that the drafters of the Warner Series B certificate of designations did not intend for two-thirds of the Series B stockholders to have a veto over every merger in which their interest would be adversely affected because the right to vote was conferred expressly (as it must under Delaware law),[19] and "only in narrowly

---

12. *Id.* at 300 n. 295.

13. *Id.* at 307.

14. *Id.* at 309.

15. This last qualification is irrelevant to this case since, as the Court of Chancery correctly noted, there is no requirement in the Delaware General Corporation Law ("DGCL") that preferred stockholders vote to approve a proposed merger. *See* R. FRANKLIN BALOTTI & JESSE A. FINKELSTEIN, THE DELAWARE LAW OF CORPORATIONS AND BUSINESS ORGANIZATIONS § 9.15, at 9–26 (3d ed. 1998) ("Whether or not the holders of shares are entitled to vote

on a merger is governed by the provisions of the certificate of incorporation setting forth the voting rights of the shares of stock .").

16. 583 A.2d 962.

17. *Mem. Op.* at 16–18.

18. *Warner*, 583 A.2d at 965.

19. *See, e.g., Rothschild Int'l Corp. v. Liggett Group, Inc.*, Del.Supr., 474 A.2d 133, 136 (1984). This issue is further explicated hereafter. *See infra* notes 46 and 47 and accompanying text.

defined circumstances ... not present here." [20] The two provisions in the certificate of designations involved in *Warner* were as follows. Section 3.3 provided:

> So long as any shares of Series B Stock shall be outstanding and unless the consent or approval of a greater number of shares shall then be required by law, ... the affirmative vote or written *consent* of the holders of at least two-thirds of the total number of the then outstanding shares of *Series B Stock* ... voting a class, *shall be necessary to alter or change any rights, preferences or limitations of the Preferred Stock so as to affect the holders of all such shares adversely* .... [21]

Section 3.4 provided:

> So long as any shares of Series B Stock shall be outstanding and unless the consent or approval of a greater number of shares shall then be required by law, *without* first obtaining the *consent* or approval of the holders of at least two-thirds of the number of shares *of the Series B Stock* ... *the Corporation shall not (i) amend, alter or repeal any of the provisions of the Certificate of Incorporation or By-laws of the Corporation so as to affect adversely* any of the preferences, rights, powers or privileges of the Series B Stock or the holders thereof.... [22]

We note again that nowhere in the Series B certificate of designations was found the phrase "by merger, consolidation or otherwise," which is the key phrase in the present case. Nevertheless, the heart of the *Warner* rationale, which we must address here, is that it was not the amendment, alteration or repeal of the Warner certificate that adversely affected the Warner Series B stock. The Chancellor held that it was only the conversion of the Warner Series B Preferred to Time Series BB Preferred that caused the adverse effect, and, moreover, that the conversion was permissible under 8 *Del.C.* § 251, which (unlike 8 *Del.C.* § 242) does not require a class vote on a merger. [23] Further, the Chancellor held that no contractual pro-

tection of the Warner Series B stock provided for a class vote on a merger. The Chancellor summarized his rationale in *Warner* as follows:

> 1. Section 3.4(i) does not create a right to a class vote on the proposed merger despite the fact that Warner's certificate of incorporation is being amended in the merger because, in the circumstances, the amendment itself will not "adversely affect" the Series B Preferred.

> 2. [T]he same reasoning that supports the conclusion that the proposed merger does not trigger a class vote under Section 3.4(i) requires an identical conclusion with respect to 3.3(i).

> 3. If the amendment of Warner's certificate does not trigger the class vote provisions of either 3.4(i) or 3.3(i), the dispositive question becomes whether the merger itself may trigger that result under the language of Section 3.3(i). Stated differently, the core issue here may be said to be whether the predicate words of Section 3.3(i), "alter or change," are to be read to include "convert pursuant to a merger." I conclude that Section 3.3(i) does not create a right to a class vote on a merger that will convert the Series B Preferred stock into other securities, other property or cash. [24]

In more detail, he continued:

> Section 3.4(i) provides a right to a series vote ... in the event of a charter amendment that amends, alters or repeals any provision of the certificate of incorporation so as to adversely affect the Series B Preferred or its holders.

> Warner will be the surviving corporation in the proposed merger. Its charter will be amended in the merger.... Nevertheless, Section 3.4(i) does not, in my opinion, grant a right to a series vote in these circumstances because the adverse effect upon defendants is not caused by an amendment, alteration or repeal of any provision of Warner's certificate of incor-

20. *Warner,* 583 A.2d at 964.

21. *Id.* at 964–65 (emphasis supplied).

22. *Id.* at 965 (emphasis supplied).

23. *Id.* at 969–70.

24. *Id.* at 967.

poration. Rather it is the conversion of the Warner Series B Preferred into Time Series BB Preferred that creates the adverse effect.[25]

\* \* \*

This conclusion is further supported by a review of other provisions of the certificate of designation.... [T]he drafters did expressly address the possibility of a merger in connection with the very question of a class vote by the preferred and adopted the limited protection afforded by Section 3.4(iii):

> [W]ithout ... consent ... of the Series B Stock ... the Corporation shall not ... (iii) *be a party to any transaction involving a merger,* consolidation or sale ... *in which* the *shares of Series B Stock ... are converted into the right to receive equity securities of the* surviving, resulting or *acquiring corporation ... unless such corporation shall have,* after such merger, consolidation or sale, *no equity securities either authorized or outstanding ... ranking prior,* as to dividends or in liquidation, *to the Series B Stock or to the stock of the surviving, resulting or acquiring corporation is-sued in exchange therefor.*[26]

Plaintiffs here argue that *Warner* is distinguishable for three reasons: (1) the fact that the words "whether by merger, consolidation or otherwise" were not present in the Warner Series B certificate; (2) in *Warner,* unlike here, the preferred stockholders did not remain as stockholders of the surviving corporation, whose certificate arguably was amended and on which the preferred stock-holders in *Warner* were relying for a right to a class vote; and (3) in *Warner,* unlike here, the merger was not an attempt simply to change the rights of the preferred stock, but rather there was economic and business substance to that transaction beyond an effort to do indirectly what could not be done directly.

In our view, only the first reason is valid in this appeal. The third reason cited is not before us because we do not examine the economic quality of the merger for purposes of this appeal.[27] The second reason strikes us as a distinction without a difference.[28] Here the First Series Preferred stock of Avatex is converted to common stock of the surviving corporation, Xetava, a newly formed corporation admittedly a wholly owned subsidiary of Avatex created for the sole purpose of effecting this merger and eliminating the rights of the Avatex First Series Preferred. In *Warner,* the Warner, Series B Preferred also received a new security—Time Series BB Preferred—a senior security[29] issued by the surviving corporation, Time (renamed Time Warner). This was accomplished by using TW Sub, Time's wholly-owned subsidiary, as the merger partner of Warner. Since we do not reach the question of the economic quality of the transaction,[30] it makes no difference for purposes of this analysis (as plaintiffs argue) that in *Warner* there were two distinct acts that operated independently—that the substitution of charters was between Warner and TW Sub and the exchange of shares was between Warner and Time. The operative events here are that the proposed downstream merger of Avatex into Xetava results in the conversion of Avatex stock to Xetava

25. *Id.*

26. *Id.* at 970 (emphasis in original).

27. *See Weinberger v. UOP, Inc.,* Del.Supr., 457 A.2d 701, 715 (1983) (abolishing business-purpose requirement theretofore applied to parent-subsidiary mergers and overruling *Singer v. Magnavox Co.,* Del.Supr., 380 A.2d 969 (1977)).

28. Defendants argue that "as a practical matter, plaintiffs' argument makes no sense because it would allow the preferred stock to be converted without a class vote into a less attractive security issued by a third party. Plaintiffs understandably cannot explain why a class vote should be required prior to their receipt of a less advantageous security from the surviving corporation in the merger, but no class vote is required prior to their receipt of an equally unattractive security from a third party." Defendants' Ans. Brief at 27–28.

29. It is to be remembered that in *Warner* the Series B preferred did have the limited merger protection of Section 3.4(iii) stating that they had the right to receive a comparable senior security of the surviving corporation or else they had a class vote. *See supra,* text accompanying note 26.

30. *Weinberger,* 457 A.2d at 701, 715.

stock and the elimination "by merger" of the certificate protections granted to the Avatex First Series Preferred. Thus, it is *both* the stock conversion *and* the repeal of the Avatex certificate that causes the adverse effect to the First Series Preferred. In *Warner*, it was only the stock conversion that caused the adverse effect because the phrase, "whether by merger, consolidation or otherwise" was not present.

The relevant statutory provisions are found in Sections 251(b) and 251(e) of the Delaware General Corporation Law ("DGCL"), which provide, in pertinent part:

### § 251. Merger or consolidation of domestic corporations.

\* \* \*

(b) The board of directors of each corporation which desires to merge or consolidate shall adopt a resolution approving an agreement of merger or consolidation. The agreement shall state: (1) The terms and conditions of the merger or consolidation; (2) the mode of carrying the same into effect; (3) in the case of a merger, such amendments or changes in the certificate of incorporation of the surviving corporation as are desired to be effected by the merger, or, if no such amendments or changes are desired, a statement that the certificate of incorporation of the surviving corporation shall be its certificate of incorporation; (4) in the case of a consolidation, that the certificate of incorporation of the resulting corporation shall be as is set forth in an attachment to the agreement; (5) the manner of converting the shares of each of the constituent corporations into shares or other securities of the corporation surviving or resulting from the merger or consolidation and, if any shares of any of the constituent corporations are not to be converted solely into shares or other securities of the surviving or resulting corporation, the cash, property, rights or securities of any other corporation or entity which the holders of such shares are to receive in exchange ... ; and (6) such other details or provisions as are deemed desirable. . . .

\* \* \*

(e) In the case of a merger, the certificate of incorporation of the surviving corporation shall automatically be amended to the extent, if any, that changes in the certificate of incorporation are set forth in the agreement of merger.[31]

In short, Section 251 of the DGCL describes three ways that a merger or consolidation can affect the certificate of a constituent corporation:

(1) *Section 251(b)(3) Amendments.* First, the merger agreement may call for amendments to the pre-existing certificate of the surviving corporation.[32]

(2) *Displacement and Substitution by Merger.* Second, the merger can designate the certificate of one of the constituent corporations as the certificate of the surviving entity, and thereby render the certificate of every other constituent corporation a legal nullity.[33]

(3) *Displacement and Substitution via Consolidation.* Finally, in the case of a consolidation, the certificate of the resulting corporation displaces and renders a legal nullity the certificate of every disappearing constituent corporation.[34]

In speaking of the "amendment, alteration or repeal" of the Avatex certificate by "merger, consolidation or otherwise," the drafters must have been referring to some or all of the events permitted by Section 251. Therefore, Section 251 provides the relevant backdrop for the interpretation of the First Series Preferred voting rights.

Avatex argued below, and the Court of Chancery appears to have agreed,[35] that *only*

---

**31.** 8 *Del.C.* §§ 251(b), (e).

**32.** 8 *Del.C.* §§ 251(b)(3), (e).

**33.** 8 *Del.C.* § 251(b)(3).

**34.** 8 *Del.C.* § 251(b)(4).

**35.** The Court of Chancery observed that its reading

> does not render a nullity the phrase "by merger, consolidation or otherwise," as it is easy to imagine situations where, in connection with a merger or other similar transaction, the holders of First Series Preferred would have a right

a Section 251(b)(3) Amendment to the surviving corporation's charter amounts to an "amendment, alteration or repeal" within the meaning of the provisions defining the voting rights of the preferred stockholders. Accordingly, the argument runs, these provisions would apply *only* in the circumstance (not present here) where Avatex survives the merger and its certificate is amended thereby. Since the proposed merger with Xetava does not contemplate any such amendments to the disappearing Avatex certificate, the argument goes, the transaction can go forward without a First Series class vote.

The difficulty with this reading is that it fails to account for the word *consolidation*, which appears in the phrase "by merger, consolidation or otherwise." A consolidation cannot entail a Section 251(b)(3) Amendment because in a consolidation there is no "surviving corporation" whose pre-existing certificate is subject to amendment. The resulting corporation in a consolidation is a completely new entity with a new certificate of incorporation.[36] All the certificates of the constituent corporations simply become legal nullities in a consolidation. In short, Avatex' proposed reading of the relevant provisions would render the word *consolidation* mere surplusage, and is problematic for that reason.[37]

Although the transaction before us is not a consolidation, the drafters' use of the word *consolidation* is significant. They must have intended the First Series Preferred stockholders to have the right to vote on at least some mergers or other transactions whereby the Avatex certificate—and indeed, Avatex itself—would simply disappear. Consolidation, by definition, implicates the disappearance of all constituent corporations. Here, Avatex disappears, just as it would in a consolidation. Under the terms of the proposed merger, Xetava will be the surviving entity and, since Avatex will cease its independent existence, its certificate becomes a legal nullity, as defendants concede. In our view, this constitutes a repeal, if not an amendment or alteration. Thus, the proposed merger is potentially within the class of events that trigger First Series Preferred voting rights.

The first question is: What will happen as a result of the merger to the "rights, preferences, privileges or voting power" of the Avatex First Series Preferred stock as set forth in the existing Avatex certificate? They disappear when the preferred stockholders of Avatex become common stockholders of Xetava under its certificate that does not contain those protections. We assume, as did the trial court,[38] that their elimination would affect the First Series Preferred stockholders adversely.

The second question is: What act or event will cause this adverse effect if the merger is consummated? The trial court held that, "[a]s in *Warner*," the adverse effect on the plaintiffs "will not flow from any 'amendment, alteration or repeal' of the First Series Certificate (however accomplished) but from the conversion into common stock of the First Series Preferred in the Proposed Merger."[39] The Court so held notwithstanding that it had noted the distinguishing language of the certificate here—not present in *Warner*—"whether by merger, consolidation or otherwise." But the Court dismissed this distinction by concluding that this "language only modifies the phrase 'amendment, alteration and repeal' and does not independently create a right to a class vote in the case of *every merger*."[40] But that is not the issue here where there is no contention that the

---

to a class vote on a proposed "amendment, alteration or repeal" of some provision of the Avatex Restated Certificate or the First Series Certificate proposed in connection with that transaction, although not upon the merger itself. *See* Section 251(b)(3) of the DGCL (resolution approving merger shall specify amendments, if any, to the certificate of the surviving corporation).
*Mem. Op.* at 20 n. 4.

**36.** *See* 8 *Del.C.* § 251(b)(4).

**37.** *See Sonitrol Holding Co. v. Marceau Investissements,* Del.Supr., 607 A.2d 1177, 1184 (1992) (under "cardinal rule of contract construction," court should give effect to all contract provisions).

**38.** *Mem. Op.* at 17.

**39.** *Id.* at 17–18.

**40.** *Id.* at 17 (emphasis supplied).

First Series Preferred have a right to a class vote on *every merger.*[41]

The First Series Preferred holders claim to have the right to a class vote only if (a) a transaction effects the "amendment, alteration or repeal" of the rights provided in the certificate, *and* (b) "any right, preference, privilege or voting power of the First Series Preferred" would thereby be materially and adversely affected. For example, plaintiffs make clear that the First Series Preferred would not have a class vote on mergers where they receive the same security in a new entity or are cashed out. The attributes of the First Series Preferred would be intact but for the merger or might be continued if the certificate of the corporation surviving the merger—Xetava—provided for separate classes of stock, guaranteeing to these holders those same attributes. In our view, the Court of Chancery misapplied *Warner's* holding that "the amendment contemplated [as a "housekeeping" measure post-merger] is necessitated by the merger [and the] amendment, like the conversion, flows from the merger and is not a necessary condition of it."[42] This was the case in *Warner*, but is not here. The error of the trial court here was in its conclusion that the observation in *Warner* quoted above "is at least equally apposite here, where *Avatex* is to be merged

with and into Xetava and will simply cease to maintain a separate corporate existence as a matter of law, without the necessity of any amendment, alteration or repeal" of the certificate.[43]

In our view, the merger does cause the adverse effect because the merger is the corporate act that renders the Avatex certificate that protects the preferred stockholders a "legal nullity," in defendants' words. That elimination certainly fits within the ambit of one or more of the three terms in the certificate: *amendment* or *alteration* or *repeal.* The word *repeal* is especially fitting in this context because it contemplates a nullification, which is what defendants concede happens to the Avatex certificate.[44]

▮ Articulation of the rights · of preferred stockholders is fundamentally the function of corporate drafters. Construction of the terms of preferred stock is the function of courts. This Court's function is essentially one of contract interpretation against the background of Delaware precedent. These precedential parameters are simply stated: Any rights, preferences· and limitations of preferred stock that distinguish that stock from common stock must be expressly and clearly stated, as provided by statute.[45] Therefore, these rights, prefer-

---

**41.** Contrast the rights the Second Series Preferred would have had if there had been any shares outstanding (*i.e.,* the right to vote on every merger, with certain specifically enumerated exceptions not relevant here).

**42.** *Warner,* 583 A.2d at 968.

**43.** *Mem. Op.* at 18.

**44.** In modern dictionary usage the term *repeal* has definite meaning:

> **repeal 1.** to revoke or withdraw formally or officially; **2.** to revoke or annul; **3.** the act of repealing; revocation; abrogation....
> —**Syn. 2.** nullify, abolish, rescind, invalidate.

Random House Unabridged Dictionary 1633 (2d ed.1993). Similar definitions may be found in law dictionaries of England going back to the very early nineteenth century:

> REPEAL, from the Fr. *rappel,* i.e. revocatio. A Revocation; as the *repealing* of a statute is the revoking or disannulling it.

2 The Law-Dictionary (2d ed. 1809). The terms *amendment* and *alteration* incompletely describe the effect of the proposed merger on the Avatex

charter. *Repeal* implicates nullification, which is the total (not partial) amendment or alteration. The proposed merger does not call for any changes on the face of the Avatex charter, but rather contemplates that charter will be wholly displaced by an independent document.

**45.** *See* 8 *Del.C.* § 151(a), which provides, in pertinent part:

> (a) Every corporation may issue 1 or more classes of stock or 1 or more series of stock within any class thereof, any or all of which classes may be of stock with par value or stock without par value and which classes or series may have such voting powers, full or limited, or no voting powers, and such designations, preferences and relative, participating, optional or other special rights, and qualifications, limitations or restrictions thereof, *as shall be stated and expressed* in the certificate of incorporation or of any amendment thereto, or in the resolution or resolutions providing for the issue of such stock adopted by the board of directors pursuant to authority expressly vested in it by the provisions of its certificate of incorporation....
> *Id.* (emphasis supplied).

ences and limitations will not be presumed or implied.[46] The other doctrine states that when there is a hopeless ambiguity attributable to the corporate drafter that could mislead a reasonable investor such ambiguity must be construed in favor of the reasonable expectation of the investor and against the drafter.[47] This latter doctrine is not applicable here because there is no ambiguity.

In our view, the rights of the First Series Preferred are expressly and clearly stated in the Avatex certificate. The drafters of this instrument could not reasonably have intended any consequence other than granting to the First Series Preferred stock the right to consent by a two-thirds class vote to any merger that would result in the elimination of the protections in the Avatex certificate if the rights of the holders of that stock would thereby be adversely affected. The First Series Preferred stock rights granted by the corporate drafters here are the functional equivalent of a provision that would expressly require such consent if a merger were to eliminate any provision of the Avatex certificate resulting in materially adverse consequences to the holders of that security.

The drafters were navigating around several alternatives. First, all parties agree

that pure amendment protection available to the First Series Preferred stockholders as granted by Section 242(b)(2) of the DGCL and Section 4 of the certificate does not—absent the very phrase at issue here—apply to this merger. Although *Warner* was decided after the Avatex certificate of designations became effective, *Warner* clearly supports this view and it continues to be valid precedent for that proposition.[48] Second, all parties agree that if Avatex would have been the survivor, and its certificate were amended in the merger as contemplated by 8 *Del.C.* § 251(c)(3), the First Series Preferred would have the right to consent by two-thirds class vote. Third, all parties agree that the right to consent to *any* merger that was granted (subject to certain exceptions not relevant here) to the Second Series Preferred stock (of which none is outstanding) was not intended to be granted to the First Series holders whose rights are more narrowly circumscribed. In their case: (a) the merger must be the cause of an "amendment alteration or repeal" of the certificate (not all mergers do this); and (b) their rights must be adversely affected (which does not inevitably occur in a merger).

█ If Section 6 of the certificate does not guarantee a class vote to the First Series

46. *Rothschild Int'l Corp. v. Liggett Group Inc.,* Del.Supr., 474 A.2d 133, 136 (1984). *See also Waggoner v. Laster,* Del.Supr., 581 A.2d 1127, 1134-35 (1990). In *Waggoner,* the term "strictly construed" was used when describing the judicial approach to determining stock preferences in a case where the holding was that a general reservation clause in a certificate of incorporation was insufficient to expressly reserve authority in the board to establish preferences. We continue to approve that holding, but we do not approve the continued use of the term "strict construction" as appropriately describing the judicial process of analyzing the existence and scope of the contractual statement of preferences in certificates of incorporation or certificates of designations. We believe that the appropriate articulation of that analysis was set forth in our opinion in *Rothschild:* "Preferential rights are contractual in nature and therefore are governed by the express provisions of a company's certificate of incorporation. Stock preferences must also be clearly expressed and will not be presumed." 474 A.2d at 136. The term "strict construction" (as contrasted to "liberal construction") is often used to describe the approach to statutes in derogation of common law, *see Waggoner,* 581 A.2d at 1135 n. 9, or to certain con-

tracts (*e.g.,* forfeitures, penalties and restrictive covenants, *see* 4 WALTER H.E. JAEGER, WILLISTON ON CONTRACTS § 602A (3d ed.1961)). In light of other doctrines, continued use of the term "strict construction" as a substitute for, or gloss on, the *Rothschild* formulation is problematic. *See infra* note 47.

47. This latter doctrine is stated in this Court's decision in *Kaiser Aluminum,* where there was a hopeless ambiguity—a patent drafting error—that arose, not in the creation of preferred stock rights, but in the statement of the antidilution provision that protected the preferred stock on a recapitalization of the common shares into which the preferred was convertible. *See also SI Management L.P. v. Wininger,* Del.Supr., 707 A.2d 37, 42 (1998).

48. 583 A.2d at 970 (relying on *Orzeck v. Englehart,* Del.Supr., 195 A.2d 375 (1963), for the "bedrock doctrine of independent legal significance," which establishes that class voting rights granted under 8 *Del.C.* § 242(b)(2) and parallel contractual provisions in a certificate do not apply in a merger and that only the provisions of 8 *Del.C.* § 251 and any express certificate provisions need be satisfied).

Preferred in this merger, what could it conceivably be interpreted to mean? Defendants argue that the certificate can be construed to apply *only* in the second instance noted above—namely, in the case where Avatex is the survivor and its certificate is amended, altered or repealed, as contemplated by Section 251(b)(3). But, as plaintiffs point out, this cannot be the *only* outcome the drafters intended because the certificate grants the First Series Preferred this protection in a consolidation where Section 251(b)(3) does not apply.[49] Because the word *consolidation* is included, it cannot reasonably be argued that the protections of Section 6 of the certificate applicable to the First Series Preferred are confined to a Section 251(b)(3) amendment. Therefore, the term *consolidation* cannot be ignored or wished away as surplusage, as defendants argue. It is well established that a court interpreting any contractual provision, including preferred stock provisions, must give effect to all terms of the instrument, must read the instrument as a whole, and, if possible, reconcile all the provisions of the instrument.[50]

## Conclusion

The Court of Chancery held, and defendants contend on appeal, that *Warner* compels a different result from that which we reach because *Warner* held that there it was only the stock conversion, not the amendment that adversely affected the preferred. But the short answer here is that the language of the First Series Preferred stock is materially different from the language in *Warner* because here we have the phrase, "whether by merger, consolidation or otherwise." This provision entirely changes the analysis and compels the result we hold today. Here, the repeal of the certificate and the stock conversion cause the adverse effect.

It is important to place what we decide today in proper perspective. The outcome here continues a coherent and rational approach to corporate finance.[51] The contrary result, in our view, would create an anomaly and could risk the erosion of uniformity in the corporation law. The Court of Chancery was mindful of this concern in referring to our general observations in *Kaiser* that the

49. We need not wrestle with the words "or otherwise" as the Court of Chancery did in applying a different provision in *Sullivan Money Management Inc. v. FLS Holdings Inc.,* Del.Ch., C.A. No. 12731, 18 Del.J.Corp.L. 1183, 1190, 1992 WL 345453 (Nov. 20, 1992), *aff'd,* Del.Supr., 628 A.2d 84 (1993) (holding that *Warner* governs and that certificate providing class vote to preferred in the event of "change, by amendment to the Certificate ... or otherwise the terms and provisions of the ... Preferred Stock so as to affect adversely the rights and preferences of the holders ..." *does not require class vote in cash-out merger* because the term "or otherwise" did not clearly and expressly apply to mergers).

Defendants also rely on *Aaron v. Empresas La Moderna,* N.D.Cal. No. C. 97–0233 FMS, 1997 U.S.Dist. Lexis 17194 (1997), a decision of the United States District Court for the Northern District of California, in which the court was called upon to apply Delaware law. The court applied *Warner* to a certificate provision substantially identical to that presented here (mandating that a vote of preferred stock is necessary for any "amendment, alteration or repeal whether by merger, consolidation or otherwise"). The court simply held that *Warner* applied, and compelled the same result because "a stock conversion pursuant to a merger that adversely affects the preferred shareholders is distinct from changes to a certificate of incorporation following a merger." *Slip op.* at 19. We need not discuss the distinguishing characteristics of that case as argued by

plaintiffs. It is sufficient to say, with all due respect to the court in *Aaron,* that *Warner* was simply misapplied because the certificate provisions in *Aaron*—as in this case—are materially different from those in *Warner.* We pause to note that our certification procedure might have aided the court in Aaron to seek an answer from this Court to the question whether *Warner* compelled the result there or is distinguishable. Del. Const. art. IV, § 11(a); Supr.Ct.R. 41.

50. *See Kaiser Aluminum,* 681 A.2d at 395; *Sonitrol Holding Co.,* 607 A.2d at 1184.

51. *See* Buxbaum, *supra* note 11, at 243:

> Preferred Stock is an anomalous security. It is a debt security when it claims certain absolute rights.... It is an equity security when it tries to control the enterprise through a practical voting procedure or to share in excess distributions of corporation profits. Of course, a share of preferred stock is actually a composite of many rights.
>
> \* \* \*
>
> The primary source of a share's legal rights is the share contract. There is no ideal preferred stock but only a collection of attributes which the share contract says makes up a share of preferred stock. The share contract, in turn, is found in the articles of incorporation and the applicable state statutes.

(footnotes omitted).

courts should avoid creating enduring uncertainties as to the meaning of boilerplate provisions in financial instruments.[52] To be sure, there are some boilerplate aspects to the preferred stock provisions in the Avatex certificate and those found in other cases. But one is struck by the disuniformity of some crucial provisions, such as the differences that exist when one compares the provisions in *Warner* and *Sullivan* with those presented here. That lack of uniformity is no doubt a function of (a) the adaptations by different drafters of some standard provisions; (b) negotiations by preferred stock investors seeking certain protections; (c) poor drafting; or (d) some combination of the above. The difference between the provisions in the Warner certificate and the Avatex provisions are outcome-determinative because we find there is no reasonable interpretation of the Avatex certificate that would deny the First Series Preferred a class vote on an "amendment, alteration or repeal ... by merger, consolidation or otherwise" of the protective provisions of the Avatex certificate.

The path for future drafters to follow in articulating class vote provisions is clear. When a certificate (like the Warner certificate or the Series A provisions here) grants only the right to vote on an amendment, alteration or repeal, the preferred have no class vote in a merger. When a certificate (like the First Series Preferred certificate here) adds the terms "whether by merger, consolidation or otherwise" and a merger results in an amendment, alteration or repeal that causes an adverse effect on the preferred, there would be a class vote. When a certificate grants the preferred a class vote in any merger or in any merger where the preferred stockholders receive a junior security, such provisions are broader than those involved in the First Series Preferred certificate. We agree with plaintiffs' argument that these results are uniform, predictable and consistent with existing law relating to the unique attributes of preferred stock.

The judgment of the Court of Chancery is reversed and the matter is remanded for further proceedings consistent with this Opinion.

---

52. *Mem.Op.* at 22 (citing *Kaiser*, 681 A.2d at 398).