KAISER ALUMINUM CORPORATION, Maxxam, Inc., George T. Haymaker, Jr., Robert M. Cruikshank, Charles E. Hurwitz, Ezra G. Levin, Robert Marcus, and Robert J. Petris, Defendants Below, Appellants,

v.

Donald MATHESON and Marilyn T. Page, Plaintiffs Below, Appellees.

No. 168, 1996.

Supreme Court of Delaware.

Submitted: May 21, 1996.
Decided: Aug. 29, 1996.

Robert K. Payson (argued), Donald J. Wolfe, Jr., Arthur L. Dent and Kevin R. Shannon, of Potter, Anderson & Corroon, Wilmington, for Appellants Kaiser Aluminum Corporation, Robert Marcus, Robert J. Petris, Robert M. Cruikshank and George T. Haymaker; Norman J. Blears and Joy Cartun of Heller Ehrman White & McAuliffe, Palo Alto, of counsel for Appellants Robert Marcus and Robert J. Petris.

Martin P. Tully, Frederick Alexander and William M. Lafferty, of Morris, Nichols, Arsht & Tunnell, Wilmington, for Appellants MAXXAM, Inc., Charles E. Hurwitz and Ezra G. Levin.

William Prickett and Ronald A. Brown, Jr. (argued), of Prickett, Jones, Elliott, Kristol & Schnee, Wilmington, Arthur T. Susman, of Buehler & Watkins, Chicago, of counsel for Appellees Donald Matheson and Marilyn T. Page.

Before VEASEY, C.J., HARTNETT and BERGER, JJ.

VEASEY, Chief Justice:

In this interlocutory appeal, we affirm a preliminary injunction order of the Court of Chancery enjoining the effectuation of a corporate recapitalization on the ground that the existing conversion rights of preferred stockholders cannot be adjusted as set forth in the proposed recapitalization without the consent of the preferred holders. Specifically, we hold that the existing conversion rights of the preferred stockholders, as ambiguously stated in the Certificate of Designations, should be construed in favor of the preferred holders to require conversion to the common stock which existed before the recapitalization, not the new common stock resulting from the recapitalization.

*Facts*

Kaiser Aluminum Corporation ("Kaiser"), its directors and its controlling stockholder, MAXXAM, Inc., appeal from the grant of a preliminary injunction preventing Kaiser from implementing a recapitalization plan (the "Recapitalization"). The Recapitalization would create two classes of common stock with one class having disparate voting rights from the existing single class of common stock ("Existing Common Stock"). This result would be achieved by an amendment to the certificate of incorporation reclassifying the 100 million authorized shares of Existing Common Stock as one class of Class A Common shares ("New Class A Common") with full voting rights. The Recapitalization would also authorize the issuance of an additional 250 million shares of new, low-voting common stock ("New Common Stock") possessing voting rights of 1/10 vote per share. Current holders of Existing Common Stock will receive .33 shares of New Class A Common and .67 shares of New Common for each share of Existing Common Stock.

MAXXAM owns 50 million shares of the 71.6 million shares of Existing Common Stock currently outstanding. The Plaintiffs own shares of Preferred Redeemable Increased Dividend Equity Securities ("PRIDES") issued by Kaiser in February of 1994.[1] Kaiser has issued 8,673,850 of the 20,000,000 shares of PRIDES authorized by its Certificate of Incorporation. The PRIDES are convertible into .8333 shares of Common Stock[2] at the option of the holder prior to December 31, 1997. Between December 31, 1996 and December 31, 1997, Kaiser can redeem the PRIDES at a conversion ratio based on the market price of the Common Stock but subject to a minimum

---

**1.** One of the plaintiffs, Donald Matheson, also owns common shares of Kaiser.

**2.** Since the crux of the debate between the parties is whether the PRIDES are convertible into the Common Stock as it exists prior to the proposed recapitalization (*i.e.,* "Existing Common Stock") or in its altered, post-recapitalization

form, the generic term "Common Stock" is used here in place of the term "Existing Common Stock." This terminology matches the language of the Certificate of Designations which, aside from the anomalous reference in § 3(d)(i) discussed *infra,* refers simply to "Common Stock."

redemption value of .8333 shares of Common Stock for each share of PRIDES. On December 31, 1997, each share of PRIDES converts automatically into one share of Common Stock. The PRIDES have 4/5 vote per share and vote with the common shares.

Kaiser intends to adjust the conversion ratio for the PRIDES so that each share of PRIDES will convert on December 31, 1997 into .33 shares of New Class A Common and .67 shares of New Common. The Plaintiffs filed suit on March 19, 1996 seeking, *inter alia*, to enjoin the special stockholders' meeting scheduled for April 10, 1996 at which a vote on the Recapitalization was to be taken. The Plaintiffs asserted four claims in their complaint: (1) that the Certificate of Designations (the "Certificate")[3] for the PRIDES does not permit Kaiser to change, pursuant to a reclassification, the security into which the PRIDES are convertible; (2) that Kaiser is required to procure a separate class vote of the PRIDES; (3) that the proxy statement issued in connection with the special meeting omits material facts and misstates material facts; and (4) that the Recapitalization is the result of breaches of the duties of care and loyalty owed to the Plaintiffs by the directors of Kaiser and its controlling stockholder, MAXXAM.

On April 10, 1996, the Court of Chancery issued a preliminary injunction against the consummation of the amendment to the Certificate of Incorporation but allowed the meeting and vote to proceed. The meeting was adjourned until May 1, 1996. On April 19, 1996, this Court granted the Defendants' motion for an expedited interlocutory appeal. The special meeting was held on May 1, 1996 and the proposal received the vote of a majority of outstanding shares.

### *Standard and Scope of Review*

Preliminarily, we must address the proper standard of review of the Court of Chancery's decision to grant the preliminary injunction. The plaintiffs contend that this appeal from the grant of a preliminary injunction should be reviewed only for abuse of discretion.

■ Generally, the grant or denial of a preliminary injunction is reviewed for abuse of discretion. *Wilmington Sav. Fund Society, FSB v. Covell*, Del.Supr., No. 152, 1990, 1990 WL 84687, Walsh, J. (May 16, 1990) (ORDER); *Plant Indus. v. Katz*, Del.Supr., No. 123, 1981, 435 A.2d 1044, Quillen, J. (May 1, 1981) (ORDER). Federal appellate courts follow the same approach. *See Doran v. Salem Inn, Inc.*, 422 U.S. 922, 931–32, 95 S.Ct. 2561, 2568, 45 L.Ed.2d 648 (1975) ("[T]he standard of appellate review is simply whether the issuance of the injunction, in the light of the applicable standard, constituted an abuse of discretion."); *see also DSC Communications Corp. v. DGI Technologies, Inc.*, 5th Cir., 81 F.3d 597, 599 (1996). Nevertheless, this Court reviews the grant of a preliminary injunction without deference to the embedded legal conclusions of the trial court. *See Unitrin, Inc. v. American Gen. Corp.*, Del.Supr., 651 A.2d 1361 (1995).[4]

■ The decision to grant or deny a preliminary injunction requires the trial court to consider whether the plaintiff has established: (1) a reasonable probability of success on the merits; (2) irreparable harm; and (3) a balance of equities in its favor. *Allen v. Prime Computer, Inc.*, Del.Supr., 540 A.2d 417, 419 (1988). Here, the Court of Chancery proceeded to the "probability of success" prong and granted the injunction based solely on the language of the Certificate, the Proxy Statement and the Prospectus. Accordingly, we will consider *de novo* the meaning of the Certificate. *Waggoner v. Laster*, Del.Supr., 581 A.2d 1127, 1132–33 (1990).

---

**3.** When the Certificate of Designations became effective in February of 1994, it had the effect of amending the Certificate of Incorporation so that the rights of the preferred stockholders fixed by the Certificate became part of the Certificate of Incorporation. 8 *Del.C.* §§ 102(a)(4); 151(g).

**4.** As the Plaintiffs recognize, this Court has often reviewed the grant or denial of a preliminary injunction in corporate litigation. *See, e.g., Uno-*

*cal Corp. v. Mesa Petroleum Co.*, Del.Supr., 493 A.2d 946 (1985); *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.*, Del.Supr., 506 A.2d 173 (1985); *Ivanhoe Partners v. Newmont Mining Corp.*, Del.Supr., 535 A.2d 1334 (1987); *Mills Acquisition Co. v. Macmillan, Inc.*, Del.Supr., 559 A.2d 1261 (1988); *Paramount Communications, Inc. v. Time Inc.*, Del.Supr., 571 A.2d 1140 (1989). In all of these cases, this Court has exercised *de novo* review of legal issues.

### Interpretation of the Certificate

 The preferences and conversion rights of the PRIDES are governed by the Certificate. *Wood v. Coastal States Gas Corp.*, Del.Supr., 401 A.2d 932, 937 (1979); *Jedwab v. MGM Grand Hotels, Inc.*, Del.Ch., 509 A.2d 584, 593 (1986). The Certificate is interpreted using standard rules of contract interpretation which require a court to determine from the language of the contract the intent of the parties. *Waggoner*, 581 A.2d at 1134. In discerning the intent of the parties, the Certificate should be read as a whole and, if possible, interpreted to reconcile all of the provisions of the document. *Warner Communications Inc. v. Chris–Craft Indus., Inc.*, Del.Ch., 583 A.2d 962, 967, *aff'd*, Del. Supr., 567 A.2d 419 (1989).

 If no ambiguity is present, the Court must give effect to the clear language of the Certificate. *Johnston v. Tally Ho, Inc.*, Del.Super., 303 A.2d 677, 679 (1973). "A contract is not rendered ambiguous simply because the parties do not agree upon its proper construction. Rather, a contract is ambiguous only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings." *Rhone–Poulenc Basic Chems. Co. v. American Motorists Ins. Co.*, Del.Supr., 616 A.2d 1192, 1196 (1992) (insurance contract). In this case, as in the context of the insurance contract under consideration in *Rhone–Poulenc*, "[t]he true test is not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant." *Id.* (citing *Steigler v. Insurance Co. of N. America*, Del.Supr., 384 A.2d 398, 401 (1978) (contracts should be read to accord with the reasonable expectations of a reasonable purchaser)). Where, as here, the ultimate purchaser of the securities is not a party to the drafting of the instrument which determines her rights, the reasonable expectations of the purchaser of the securities must be given effect.

 The PRIDES are a convertible security. Accordingly, the Certificate sets forth detailed language broadly referred to as anti-dilution adjustments.[5] Such provisions protect the value of the conversion feature in the case of certain events which could otherwise reduce the value of that into which the PRIDES convert, namely the Common Stock of Kaiser.

The provision at issue is section 3(d)(i) of the Certificate, which states:

(d) *Common Equivalent Rate and Optional Conversion Rate Adjustments.*

\* \* \* \* \* \*

(i) If the Corporation shall either:

(1) pay a dividend or make a distribution with respect to Common Stock [6] in shares of Common Stock,

(2) subdivide or split its outstanding shares of Common Stock into a greater number of shares,

(3) combine its outstanding shares of Common Stock into a smaller number of shares, or

(4) *issue by reclassification of its shares of **Common Stock** any shares of **common stock** of the Corporation*

then, in any such event, [the conversion rates] in effect immediately prior thereto shall each be adjusted so that the *holder of a share of PRIDES shall be entitled to receive, on the conversion of such share of PRIDES, the number of shares of Common Stock of the Corporation which such holder would have owned or been entitled to receive* after the happening of any of the events described above had such share of PRIDES been converted ... *immediately prior to the happening of such event* ...

(Emphasis supplied.) Kaiser contends that the provision contemplates that the PRIDES holders will receive on conversion "whatever new securities the holders of the underlying security received in the corporate transactions covered by those adjustment provisions."

**5.** The issues presented by this case are not of recent origin. *See Parkinson v. West End St. Ry. Co.*, Sup.Jud.Ct., 173 Mass. 446, 53 N.E. 891 (1899) (Holmes, J.) (considering rights of convertible security holders); George S. Hills, *Convertible Securities: Legal Aspects and Draftsmanship*, 19 CAL.L.REV. 1 (1930); Richard M. Buxbaum, *Preferred Stock: Law and Draftsmanship*, 42 CAL.L.REV. 243 (1954).

**6.** Common Stock is defined as "fully paid and non-assessable shares of common stock of the Corporation." Certificate § 3(a)(i).

The Plaintiffs contend that the use of upper case (Common Stock) and lower case (common stock) in different parts of 3(d)(i)(4) compels the result reached below:

Section 3(d)(i)(4) clearly differentiates between two kinds of stock: (1) the "Common Stock" that is being reclassified and (2) the "common stock" that is newly issued as a result of the reclassification. The operative language of the "then" clause of the anti-dilution provision states that after such a reclassification the PRIDES still converts into the "Common Stock" that was reclassified—whatever it is—rather than the new "common stock."

Kaiser's explanation for the use of "Common Stock" in the then clause of the Certificate is less than satisfying. Kaiser explains the use of "Common Stock" as follows:

Why then is the term lower case "common stock" used at all in the "if" clause? The drafter was simply distinguishing between the old and the new. Prior to the effectiveness of a reclassification, the new common stock would not yet have been substituted into the conversion rate; accordingly, it would have been inappropriate to use the specific defined term from Section 3(a)(i), which dealt only with the conversion rate. The capitalized term in the "then" clause refers to the same stock, but only after it has been substituted for the old stock in the conversion rate.

The Certificate could have stated clearly the result for which Kaiser contends by drawing from the Certificate itself. It did not clearly so state. As the plaintiffs point out, section 3(e) contains the traditional language employed to achieve such a result. It states:

(e) *Adjustment for Certain Mergers and Other Transactions.* In case of any consolidation or merger . . . each share of PRIDES shall, after consummation of such transaction, be subject to . . . conversion . . . into the kind and amount of securities, cash, or other property receivable upon consummation of such transaction by a holder of

the number of shares of Common Stock into which such share of PRIDES might have been converted immediately before consummation of such transaction. . . .

Other examples also illustrate the ease with which the documents governing convertible securities can express such an intent. The Model Debenture Indenture specifically treats a reclassification in such a manner:

If any . . . reclassification of the capital stock of the Company . . . shall be effected in such a way that holders of Common Stock shall be entitled to receive stock, securities or assets with respect to or in exchange for Common Stock, then, . . . the Company . . . shall execute . . . a supplemental indenture providing that the Holder of each Debenture then Outstanding shall have the right thereafter and until the expiration of the period of convertibility to convert such Debenture into the kind and amount of stock, securities or assets receivable upon such . . . reclassification . . . by a holder of the number of shares of Common Stock into which such Debenture might have been converted immediately prior to such . . . reclassification. . . .

American Bar Foundation, *Commentaries on Model Debenture Indenture Provisions,* Article Thirteen, Conversion—Sample Provisions § 13–6 (Alternate 1) (1971).

Unlike the Model Debenture Indenture, the more recent Model Simplified Indenture (the "MSI") adjusts the conversion rate in the case of a reclassification in a manner more similar to the Certificate. In fact, the Certificate bears a striking resemblance, in certain respects, to the analogous MSI provision. The MSI provides:

**Section 10.06. Adjustment for Change in Capital Stock.**

If the Company:

(1) pays a dividend or makes a distribution on its Common Stock[7] in shares of its Common Stock;

---

7. Unlike the Certificate, section 10.01 of the MSI defines Common Stock as "Common Stock of the

Company as it exists on the date of this Indenture as originally signed."

(2) subdivides its outstanding shares of Common Stock into a greater number of shares;

(3) combines its outstanding shares of Common Stock into a smaller number of shares;

(4) makes a distribution on its Common Stock in shares of its capital stock other than Common Stock; or

(5) issues by reclassification of its Common Stock any shares of its capital stock,

then the conversion privilege and the conversion price in effect immediately prior to such action shall be adjusted so that the Holder of a Security thereafter converted may receive the number of shares of capital stock of the Company which he would have owned immediately following such action if he had converted the Security immediately prior to such action.

The adjustment shall become effective immediately after the record date in the case of a dividend or distribution and immediately after the effective date in the case of a subdivision, combination or reclassification.

If after an adjustment a Holder of a Security upon conversion of it may receive shares of two or more classes of capital stock of the Company, the Company shall determine the allocation of the adjusted conversion price between the classes of capital stock. After such allocation, the conversion privilege and the conversion price of each class of capital stock shall thereafter be subject to adjustment on terms comparable to those applicable to Common Stock in this Article.

Model Simplified Indenture, 38 Bus.Law. 741, 765–766 (Feb.1983).

The MSI employs the term "capital stock" in the then clause.[8] If the Certificate used "common stock," instead of "Common Stock," in the then clause, the capitalization would match the MSI. Such a choice of capitalization would more clearly yield the result for which Kaiser argues since Plaintiffs could not argue that they are entitled to the existing "Common Stock." They would receive upon conversion whatever "common stock" was issued in the reclassification.

Noticeably absent, as well, is a paragraph similar to the last paragraph of section 10.06 of the MSI, which specifically contemplates a dual-class reclassification. Had such a provision been present, an interpretation of the Certificate which did not allow the company to convert the PRIDES into two classes of common stock would leave that section as surplusage.

Our consideration of these alternative formulations does not mean, of course, that issuers must follow model provisions. Such models are an aid to drafting and construction. If they are borrowed verbatim by the drafters, interpretation may be enhanced, but interpretation may become problematic if the drafter excludes key language from the model provision.

Reference to such models also does not imply that the Plaintiffs' interpretation is necessarily correct or completely satisfying. The Certificate is hopelessly unclear on the very point at issue. Other efforts at anti-dilution provisions indicate, however, that the Certificate could have clearly stated the intent for which Kaiser now argues. That much is evident from widely available models and other provisions of the Certificate.

When a contract is ambiguous, a court normally relies upon extrinsic evidence of the parties' intent. Such a course is not appropriate in this case for two reasons. First, such an investigation would reveal information about the thoughts and positions of, at most, the issuer and the underwriter. Whether these parties can legitimately be viewed as "negotiating" indenture provisions is a subject of some dispute. *Compare Prescott, Ball & Turben v. LTV Corp.*, S.D.N.Y., 531 F.Supp. 213, 217 (1981), *with Morgan Stanley & Co., Inc. v. Archer Daniels Midland Co.*, S.D.N.Y., 570 F.Supp. 1529, 1541 (1983); *see also* Martin Riger, *The Trust Indenture as Bargained Contract: The Persistence of Myth*, 16 J.Corp.L. 211, 216 (1991); Dale B. Tauke, *Should Bonds Have*

---

8. The Certificate uses the narrower term "common stock" to exclude reclassifications in which preferred stock is issued. Such a reclassification would, arguably, be covered by section 3(d)(iii).

*More Fun? A Reexamination of the Debate Over Corporate Bondholder Rights*, 1989 CO-LUM.BUS.L.REV. 1, 23–24 (1989). Since these sorts of provisions "are ... not the consequence of the relationship of particular borrowers and lenders and do not depend upon particularized intentions of the parties to an indenture," evidence of the course of negotiations would not be helpful. *Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*, 2d Cir., 691 F.2d 1039, 1048 (1982); *see also* Tauke, 1989 COLUM.BUS.L.REV. at 82 ("the search for expectations is complicated by the fact that investors constitute a diverse group").

Second, we are reluctant to risk disuniformity by adverting to evidence of the course of negotiation in a setting in which the same language can be found in many different contracts. A leading case in the interpretation of indenture provisions remarks:

> Whereas participants in the capital markets can adjust their affairs according to a uniform interpretation, whether it be correct or not as an initial proposition, the creation of enduring uncertainties as to the meaning of boilerplate provisions would decrease the value of all debenture issues and greatly impair the efficient working of capital markets. Such uncertainties would vastly increase the risks and, therefore, the costs of borrowing with no offsetting benefits either in the capital market or in the administration of justice. Just such uncertainties would be created if interpretation of boilerplate provisions were submitted to juries sitting in every judicial district in the nation.

*Sharon Steel Corp.*, 691 F.2d at 1048; *accord Broad v. Rockwell Int'l Corp.*, 5th Cir., 642 F.2d 929, 943 (1981). While future adjudications in the Court of Chancery do not pose the same risk of inconsistent interpretations, individual factual determinations about who drafted what would introduce a similar degree of inconsistency between identically worded documents.

We are left then with a hopelessly ambiguous contract and a reluctance to rely upon extrinsic evidence.

### Burden of the Ambiguity

It is a well-accepted principle that ambiguities in a contract should be construed against the drafter. RESTATEMENT (SECOND) OF CONTRACTS § 206 (1981); *see also* Arthur L. Corbin, *et* al., CORBIN ON CONTRACTS § 559, supp. at 337 (1960 & Supp.1996) ("imposed as a matter of public policy as a penalty for bad draftsmanship"). Courts have disagreed, however, whether the principle should apply in the case of detailed indentures or similar documents.[9] This reflects, in part, contrasting views regarding the respective roles played by underwriters and issuers. *See, e.g., Simons v. Cogan*, Del.Ch., 542 A.2d 785, 791 (1987), *aff'd*, Del.Supr., 549 A.2d 300 (1988) ("Underwriters of convertible securities do have an interest in negotiating protection on points regarded as material by ultimate purchasers of those securities."); *Metropolitan Life Ins. Co. v. RJR Nabisco, Inc.*, S.D.N.Y., 716 F.Supp. 1504, 1509 (1989) ("Since the underwriters must then sell or place the bonds, they necessarily negotiate in part with the interests of the buyers in mind.").

In *B.S.F. Co. v. Philadelphia Nat'l Bank*, Del.Supr., 204 A.2d 746 (1964), the Court reversed a decision of the Court of Chancery which construed against the issuer what the Court of Chancery considered an ambiguous indenture provision. This Court, applying Pennsylvania law, *did not* consider the applicability of the principle to indentures because it found that the language was not ambiguous. *Id.* at 751 ("The difficulty we think with this holding is that there is no ambiguity in the Indenture."). Unlike the indenture at issue in *B.S.F.*, however, the ambiguity here is manifest and insoluble.

We agree that "[w]hile debtor corporations are not the actual drafters of bond contracts, they are in a much better position to clarify the meaning of ... contract terms in advance of disputes than are investors generally." Tauke, 1989 COLUM.BUS.L.REV. at 87. The issuer is "better able to clarify unclear bond contract terms in advance so as to avoid

---

9. *Compare Prescott, Ball & Turben v. LTV Corp.*, S.D.N.Y., 531 F.Supp. 213, 217 (1981), *with Mor-* *gan Stanley & Co., Inc. v. Archer Daniels Midland Co.*, S.D.N.Y., 570 F.Supp. 1529, 1541 (1983).

future disputes and therefore should bear the drafting burden that the *contra proferentem* principle would impose upon it." *Id.* at 89; *see also Simons*, 542 A.2d at 786 ("the purchaser ... is offered, and voluntarily accepts, a security whose myriad terms are highly specified"). Moreover, when faced with an ambiguous provision in a document such as the Certificate, the Court must construe the document to adhere to the reasonable expectations of the investors who purchased the security and thereby subjected themselves to the terms of the contract. *Rhone–Poulenc*, 616 A.2d at 1196.

We caution against this principle becoming "a short-cut for avoiding the sometimes difficult tasks of determining expectations...." Tauke, 1989 COLUM.BUS.L.REV. at 88. Certificates of Designation and indentures are necessarily complex documents prepared by sophisticated drafters. They require some effort and careful thought to understand. In the normal course of events, the four corners of the document will yield a result which is consistent with reasonable expectations. *See* William W. Bratton, Jr., *The Interpretation of Contracts Concerning Corporate Debt Relationships*, 5 CARDOZO L.REV. 371, 379 (1984). We apply the *contra proferentem* principle here only as a last resort because the language of the Certificate presents a hopeless ambiguity, particularly when alternative formulations indicate that these provisions could easily have been made clear.[10]

### Conclusion

The Vice Chancellor's approach in this case was correct and well done, particularly considering the fact that his decisionmaking in this complex and unusual matter was accomplished in the very short time frame appropriate for injunction proceedings. We share the Vice Chancellor's concern that it is difficult to find that drafters of sophisticated corporate documents left such an ambiguity as this one and were relegated to rely on the uppercase-lowercase rationale. The Vice Chancellor correctly concluded that this rationale could not save the corporate document from foundering on the reef of its own ambiguity.

10. *Contra Prescott, Ball & Turben v. LTV Corp.,*

Since we hold that the Certificate does not permit Kaiser unilaterally to change the conversion rights of the PRIDES, as contemplated in the proposed amendment to its Certificate of Incorporation, we need not reach the other contentions raised by the parties. Our disposition here is limited to the question of whether the preliminary injunction ordered by the Court of Chancery was properly granted. We do not speculate on future steps the parties may undertake in light of this Opinion. In order to secure more permanent relief, Plaintiffs must still press their claims at the trial level. Accordingly, the interlocutory order of the Court of Chancery granting the preliminary injunction is **AFFIRMED** and the matter is **REMANDED** to the Court of Chancery for further proceedings consistent with this Opinion. Jurisdiction is not retained.