Andrew SHIFTAN, Andrew Silver, Article Sixth Trust U/W David H. Cogan, Brownlee O. Currey, Jr., Bruce V. Rauner, Charles Ayres, David Teiger, Dean Witter III, Equitable Trust Company C/F Ira of Tom R. Steele, Fred Tarter, Hickory Ventures Partnership, John R. Ingram, John Roche, Matthew Stedman, Paul Huffman, Roger T. Briggs, Jr., S. Randy Lampert, Scott P. George Trust, Seth E. Lemler, and the Falconwood Corp., Petitioners,

v.

MORGAN JOSEPH HOLDINGS, INC., Respondent.

Civil Action No. 6424–CS.

Court of Chancery of Delaware.

Submitted: Oct. 17, 2011.

Decided: Jan. 13, 2012.

C. Barr Flinn, Esquire, Emily V. Burton, Esquire, Paul J. Loughman, Esquire, Young Conaway Stargatt & Taylor, LLP, Wilmington, Delaware, Attorneys for Petitioners.

John L. Reed, Esquire, K. Tyler O'Connell, Esquire, DLA Piper LLP, Wilmington, Delaware; Christopher P. Hall, Esquire, DLA Piper LLP, New York, New York, Attorneys for Respondent.

## OPINION

STRINE, Chancellor.

### I. *Introduction*

Defendant Morgan Joseph Holdings, Inc. is an investment bank in which the petitioners held Series A Preferred Stock. The petitioners bought their preferred stock when Morgan Joseph was founded in 2001, helping to provide the initial funding for the company. Until late 2010, Morgan Joseph had outstanding two classes of preferred stock (Series A and Series B) and one class of common stock. The rights and designations of each series of preferred stock were set forth in Morgan Joseph's certificate of incorporation dated June 29, 2001 (the "Certificate"). On December 28, 2010, Morgan Joseph merged with another investment bank, Tri–Artisan Capital Partners, LLC (the "Merger"). Both Morgan Joseph and Tri–Artisan survived the Merger as wholly-owned subsidiaries of a newly formed entity. A new Series A Preferred Stock, which was issued by the newly formed entity and governed by a new certificate of incorporation, was offered in exchange for Morgan Joseph's old Series A Preferred Stock.

Instead of exchanging their Series A shares, the petitioners in this action demanded appraisal under 8 *Del. C.* § 262. Under the Certificate, an "Automatic Redemption" of the Series A Preferred Stock at $100 per share would have been triggered on July 1, 2011 (the "July 1 Automatic Redemption").[1] The petitioners claim that, because their stock was to be mandatorily redeemed six months after the Merger, the court should take into account the $100 per share redemption value provided for in the Certificate in determining the fair value of the Series A Preferred Stock. Morgan Joseph denies that the Certificate established an unconditional obligation to redeem the Series A Preferred Stock on July 1, 2011, contending that any redemption of the Series A could have been paid only from the "Excess Cash" (as defined in the Certificate) that Morgan Joseph had at that time, and that the company would not likely have had any. Fact discovery in the appraisal proceeding has not yet taken place.

The petitioners moved for partial summary judgment, claiming that as a matter of law the July 1 Automatic Redemption was a mandatory redemption that was not subject to a requirement that Morgan Joseph have Excess Cash available. In support of their motion, the petitioners submitted as parol evidence confidential information material used by Morgan Joseph to solicit investment in the Series A Preferred Stock in 2001 (the "Information Material") confirming their interpretation of the Certificate.

---

1. First Burton Aff. Ex. 2 ("Certificate") § B(5)(a).

Morgan Joseph challenges the petitioners' reading of the Certificate, and broadens the dispute by arguing that the July 1 Automatic Redemption right that was afforded to the Series A holders is irrelevant to the fair value analysis in an appraisal. In other words, Morgan Joseph argues that, for purposes of determining fair value in an appraisal proceeding, the court should disregard the July 1 Automatic Redemption, because this redemption right was not triggered by the Merger and had not occurred by the time that the Merger became effective. Morgan Joseph's argument would eclipse that of the petitioners, because under Morgan Joseph's approach, the court, no matter how it interprets the Certificate, would not be able to consider the July 1 Automatic Redemption in appraising the preferred stock held by the petitioners.

This motion therefore presents two discrete questions of law: (i) whether the July 1 Automatic Redemption was subject to an Excess Cash requirement under the Certificate; and (ii) whether the court may properly consider a non-speculative, contractually required redemption event set to occur six months after the Merger when determining the fair value of the Series A Preferred Stock in the petitioners' appraisal action. I answer these questions as follows.

I find that the July 1 Automatic Redemption was not subject to an Excess Cash requirement under the Certificate. It is plain from the face of the Certificate that there were two types of redemptions of the Series A Preferred Stock. The first, an Automatic Redemption, depended on the occurrence of certain events, including a sale of substantially all of Morgan Joseph's assets, certain types of mergers, or an initial public offering, that would trigger a requirement that Morgan Joseph

redeem the outstanding shares of Series A Preferred Stock and permit the Series A holders to harvest their investment. One of these specifically identified harvest events was July 1, 2011, a date ten years after Morgan Joseph's initial sale of the Series A Preferred Stock. By contrast, the second type of redemption, an "Optional Excess Cash Redemption," which I will refer to in this opinion as simply an "Optional Redemption," was an optional right to seek redemption granted to the Series A holders in the event that Morgan Joseph became profitable to the point where the company had a book value that exceeded its operating expenses by at least 200%, i.e., the Excess Cash requirement.[2] In other words, Optional Redemptions were available when requested by a Series A holder only if the company had Excess Cash, and were not automatic. The provision of the Certificate addressing Automatic Redemptions, unlike the one addressing Optional Redemptions, made no mention of Morgan Joseph needing to have Excess Cash for the redemptions to take place. Read as a whole and in context, it is clear that the Series A holders' right to an Automatic Redemption upon the occurrence of the triggering events mentioned in the Certificate were not subject to an Excess Cash requirement, and that only requests for Optional Redemptions were. This reading also makes sense in light of the nature of the events triggering an Automatic Redemption, all of which are ones that give a logical economic reason for the senior preferred equity holders to obtain the full redemption value of their shares.

Although I find that the Certificate is unambiguous, my decision in favor of the petitioners is also supported by the parol evidence in the record. In response to the

2. *Id.* § B(5)(b).

Information Material submitted by the petitioners, Morgan Joseph chose not to file a rule 56(f) affidavit or to submit any conflicting parol evidence. The Information Material is a powerful indication of the reasonable expectations of the Series A holders at the time of their investment in Morgan Joseph because it involves the very marketing materials used by Morgan Joseph in explaining the rights of the Series A Preferred Stock to those to whom it sold those securities. This parol evidence makes clear that the Certificate could not be reasonably read to subject Automatic Redemptions to an Excess Cash requirement, and that Morgan Joseph portrayed July 1, 2011 as a maturity date on which the Series A holders would get to harvest their investment on the terms set forth in the Certificate.

Furthermore, I conclude that it is appropriate for the court to consider the July 1 Automatic Redemption for purposes of the appraisal analysis, even though the Merger occurred several months before the right was triggered. But for the Merger, the right of the holders of Series A Preferred Stock would have been triggered on July 1, 2011; that was not a speculative possibility, but rather a legally required mandate of the Certificate. This redemption right is therefore distinguishable from cases in which this court has refused to consider speculative possibilities in rendering an appraisal or preferred stockholders were contractually told how their shares would be treated in the event of a merger and that their redemption rights would be extinguished on certain terms. The core mandate of § 262 requires this court to award the petitioners the "fair value of [their] *shares*." [3] In the case of an appraisal of preferred stock, therefore, the court must look at the contract rights granted to the shares being appraised under the relevant certificate of incorporation or designation in determining fair value. Thus, I must consider the unique contractual feature of the July 1 Automatic Redemption given to the Series A Preferred Stock under the Certificate when I render my final appraisal decision.

## II. *The Relevant Terms Of The Certificate And The Parties' Competing Interpretations*

Summary judgment is appropriate when there are no genuine issues as to any material fact and the moving party is entitled to judgment as a matter of law. [4] The court must view the facts in the light most favorable to the non-moving party. [5] Here, the parties do not dispute any material facts. Rather, they differ on how the Certificate is to be interpreted and whether the petitioners' right to the July 1 Automatic Redemption should be taken into account in the court's determination of fair value in an appraisal proceeding.

Both sides believe that their contractual dispute can be determined solely by reference to the terms of the Certificate. The redemption rights of the Series A holders were governed by Article FOURTH, § B(5) of the Certificate, which provided for two alternative forms of redemption: Automatic Redemptions and Optional Redemptions. Automatic Redemptions were addressed in § B(5)(a) as follows:

> To the extent any shares of Series A Preferred Stock remain outstanding ... such outstanding shares of Series A Preferred Stock shall be *automatically and mandatorily redeemed* by the Corporation ... at a rate equal to the Series A

---

**3.** 8 *Del. C.* § 262(h) (emphasis added).

**4.** Ct. Ch. R. 56(c).

**5.** *E.g., United Rentals v. RAM Holdings, Inc.,* 937 A.2d 810, 829–30 (Del.Ch.2007).

Liquidation Preference per share upon the earlier to occur of any of the following (each a "Series A Preferred Stock Automatic Redemption Event"):

i) *July 1, 2011;*

ii) the consummation of a merger or consolidation in which the holders of the voting power of the Corporation do not continue to hold at least a majority of the voting power of the surviving or resulting entity;

iii) the consummation of a sale of all or substantially all the assets of the Corporation;

iv) the consummation of an initial public offering of the Corporation's Common Stock;

v) the consummation of any transaction in which the Series A Preferred Shares are exchangeable for equity securities (including equity securities of a company other than the Corporation) of a class registered under the Securities Exchange Act of 1934.... [6]

The "Liquidation Preference" to be paid in an Automatic Redemption was defined in the Certificate as $100 per share of Series A Preferred Stock, subject to certain adjustments.[7]

Section B(5)(b) of the Certificate provided for Optional Redemptions of the Series A Preferred Stock:

Commencing with the fiscal year ending December 31, 2004, *if the Book Value ... exceeds the Operating Expenses ... by at least two hundred percent (200%) (any such excess, the "Excess Cash"),* any holder may elect to have shares of Series A Preferred Stock held by such holder and Series A Voting Warrants held by such holder redeemed by the

Corporation at a rate of $200.00 per two shares of Series A Preferred Stock and one Series A Voting Warrant.... [8]

The petitioners and Morgan Joseph draw markedly different conclusions from these provisions of the Certificate.

The petitioners argue that § B(5)(a)—the subsection addressing Automatic Redemptions—created an unconditional obligation to redeem the Series A Preferred Stock, subject only to the statutory capital requirements imposed by 8 *Del. C.* § 160. They emphasize that § B(5)(a) said nothing about Automatic Redemptions being subject to the availability of Excess Cash, while any Optional Redemptions under § B(5)(b) were expressly conditioned upon Morgan Joseph having Excess Cash available. The petitioners assert that the contrast between these two provisions shows that Automatic Redemptions were not subject to an Excess Cash requirement, pointing out that Morgan Joseph knew how to draft language that conditioned redemption upon the existence of Excess Cash, such as the language in § B(5)(b), but did not include such language in § B(5)(a).

By contrast, Morgan Joseph relies on the "Redemption Mechanisms" set forth in § B(5)(c) of the Certificate to argue that an Excess Cash requirement would in fact apply to Automatic Redemptions as well as Optional Redemptions. Section B(5)(c) provided, in relevant part:

Upon the occurrence of a Series A Preferred Stock Automatic Redemption Event, or if upon the conclusion of the Redemption Period any Optional Excess Cash Redemption Notices have been received, the Corporation shall mail a written notice ... to each holder of record of Series A Preferred Stock to be re-

---

6.  Certificate § B(5)(a) (emphasis added).

7.  *Id.* § B(3).

8.  *Id.* § B(5)(b) (emphasis added).

deemed ... specifying the date on which such redemption will occur (the "Redemption Date").... *If the Excess Cash legally available for redemption of the outstanding shares of Series A Preferred Stock on any Redemption Date ... is insufficient to redeem the total number of shares of Series A Preferred Stock to be redeemed on such date, such Excess Cash which is legally available will be used first to redeem on a pro rata basis,* based upon the number of shares for which redemption was requested or is required, the maximum possible number of shares of Series A Preferred held by stockholders who were not directors, officers, or employees of the Corporation on the date on which they acquired their shares of Series A Preferred Stock with respect to which redemption was requested or is required; *and any remaining such Excess Cash which is legally available will be used to redeem on a pro rata basis,* based upon the number of shares for which redemption was requested or is required, the maximum possible number of shares of Series A Preferred Stock held by stockholders who were directors, officers, or employees of the Corporation on the date on which they acquired their shares of Series A Preferred Stock with respect to which redemption was requested or is required.... [9]

Morgan Joseph argues that § B(5)(c) rendered the Excess Cash limitation applicable to Automatic Redemptions under § B(5)(a) as well as to Optional Redemptions under § B(5)(b). First, Morgan Joseph notes that the date on which a "Series A Preferred Stock Automatic Redemption Event" occurred was included in the defined term "Redemption Date" in the first part of § B(5)(c). Second, Morgan Joseph argues that § B(5)(c) imposed the Excess Cash requirement on Automatic Redemptions by describing what would happen if the company did not have enough Excess Cash on "any Redemption Date." [10] That is, the sentence of § B(5)(c) that detailed the distribution scheme obliquely did to Automatic Redemptions what § (B)(5)(b) did plainly and clearly to Optional Redemptions. Having supposedly made this clear in this way in § B(5)(c), there was no need for the drafters of the Certificate to refer to Excess Cash in § B(5)(a), the subsection that dealt most directly with Automatic Redemptions.

## III. The Petitioners' Motion For Partial Summary Judgment Is Granted

### A. Under The Certificate, Automatic Redemptions Were Not Subject To An Excess Cash Requirement

■ A certificate of incorporation is a contract among the stockholders of the corporation to which the standard rules of contract interpretation apply.[11] I must therefore take Delaware's well-established contract interpretation principles and apply them to the Certificate.

■ The beginning point is easy. "Contracts are to be interpreted as written, and effect must be given to their clear and

9. *Id.* § B(5)(c) (emphasis added).

10. *Id.*

11. *Waggoner v. Laster,* 581 A.2d 1127, 1134 (Del.1990); *see also Matulich v. Aegis Communs. Essar Invs., Ltd.,* 942 A.2d 596, 600 (Del.2008) (noting that "rights of preferred shareholders are primarily contractual in nature."); *In re Appraisal of Ford Holdings, Inc. Preferred Stock,* 698 A.2d 973, 977 (Del.Ch. 1997) ("To the extent it possesses any rights or powers and to the extent it is restricted or limited in any way, the relation between the holder of [preferred stock] and the corporation is contractual.").

unambiguous terms." [12]   In the first instance, the court therefore must attempt to discern the meaning of a contract and the intent of the parties from the language that they used, as read from the perspective of a reasonable third party.[13]

What is a bit more complicated here are some of the interpretive principles that come into play when a contract is "fairly susceptible of different interpretations," and therefore ambiguous.[14]  In that event, the court must turn to secondary methods of interpretation.

■ In the case of documents like certificates of incorporation or designation, the kinds of parol evidence frequently available in the case of warmly negotiated bilateral agreements are rarely available.[15] Investors usually do not have access to any of the drafting history of such documents, and must rely on what is publicly available to them to understand their rights as investors.   Thus, the subjective, unexpressed views of entity managers and the drafters who work for them about what a certificate means has traditionally been of no legal consequence, as it is not proper parol evidence as understood in our contract law.[16]

Rather, in these contexts, another method of resolving ambiguity comes into play, which involves interpreting ambiguities against the drafter.[17]  Our Supreme Court

12. *Willie Gary LLC v. James Jackson LLC,* 2006 WL 75309, at *5 (Del.Ch. Jan. 10, 2006), *aff'd,* 906 A.2d 76 (Del.2006).

13. *See SI Mgmt. L.P. v. Wininger,* 707 A.2d 37, 42 (Del.1998); *Kaiser Aluminum Corp. v. Matheson,* 681 A.2d 392, 395 (Del.1996); *Rhone–Poulenc Basic Chemicals Co. v. Am. Motorists Ins. Co.,* 616 A.2d 1192, 1196 (Del. 1992).

14. *Smith v. Nu–West Indus.,* 2000 WL 1641248, at *4 (Del. Ch. Oct. 25, 2000) (quoting *Kaiser,* 681 A.2d at 395).

15. *Compare Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.,* 702 A.2d 1228, 1232–33 (Del.1997) (holding that, if there is an ambiguous provision in a negotiated bilateral agreement, parol evidence should be considered if it would tend to help the court interpret that provision), *with Kaiser,* 681 A.2d at 397 (consideration of parol evidence for common understanding of a certificate of designation was inappropriate because it would reveal information "about the thoughts and positions of, at most, the issuer and the underwriter," not the investors in the preferred stock issued under the certificate).   Generally, if a contract is ambiguous, the court may consider parol evidence for the common understanding of the language in controversy, *see AT & T Corp. v. Lillis,* 953 A.2d 241, 253 (Del.2008), but there are limits on the evidence that may be considered for this purpose.   Only "[a]greements and negotiations prior to or contemporaneous with the adoption of a writ-ing" are admissible.  RESTATEMENT (SECOND) OF CONTRACTS § 214 (1981).   Furthermore, "unless extrinsic evidence can speak to the intent of *all* parties to a contract, it provides an incomplete guide with which to interpret contractual language," because there must be "some connection between the expectations of contracting parties revealed by extrinsic evidence and the way contract terms were articulated by those parties."  *Wininger,* 707 A.2d at 43 (emphasis in original).   *But see Airgas, Inc. v. Air Prods. & Chemicals, Inc.,* 8 A.3d 1182, 1191 (Del.2010) (the subjective belief of corporate managers that a charter prevented stockholders from moving the annual meeting date for the corporation forward if that would shorten their terms by months was accepted as evidence to resolve an ambiguity).

16. *See Kaiser,* 681 A.2d at 397–98 (refusing to consider parol evidence to interpret ambiguous certificate of designation because the evidence would not speak to the reasonable expectations of the investors); *see also Wininger,* 707 A.2d at 43–44 (finding that consideration of parol evidence was inappropriate where a general partner solicited and signed on 1,850 investors to a "take it or leave it" partnership agreement that those investors had no involvement in drafting).

17. *See* RESTATEMENT OF CONTRACTS § 206 (1981) ("In choosing among the reasonable meanings of a promise or agreement or a term

has frequently invoked this doctrine of *contra proferentem* to resolve ambiguities about the rights of investors in the governing instruments of business entities.[18] This is even true in the case of investors in preferred stock. For example, our Supreme Court held in the *Kaiser* case that when a certificate of designation of a corporation governing the rights of preferred stockholders is ambiguous, the doctrine of interpretation against the drafter should be invoked in favor of the preferred stockholders.[19] Thus, in that context, if a certificate of designation can be reasonably read in the manner the investor in preferred stock advances, the ambiguity should be resolved in her favor.[20] The policy reason for this was put clearly by the Supreme Court: "[W]hen faced with an ambiguous provision in a document such as [a certificate of designation], the court must construe the document to adhere to the reasonable expectations of the investors who purchased the security and thereby subjected themselves to the terms of the contract."[21]

■ This use of *contra proferentem* in the context of preferred stock arguably is in tension with another principle of Delaware law. A line of precedent holds that preferences claimed by preferred stockholders must be clearly set forth in a certificate of incorporation or designation and will not be presumed or implied by the court.[22] In the case of *Elliott Associates, L.P. v. Avatex Corporation*,[23] our Supreme Court recognized the potential tension in applying the doctrine of *contra proferentem* to interpret a certificate addressing preferred stock, by stating:

> [The] precedential parameters [of interpretation] are simply stated: Any rights, preference and limitations of preferred stock that distinguish that stock from common stock must be expressly and clearly stated ..., [and] will not be presumed or implied. The other doctrine states that when there is a hopeless

thereof, that meaning is generally preferred which operates against the party who supplies the words or from whom a writing otherwise proceeds.").

18. *See, e.g., Wininger*, 707 A.2d at 43 (holding that ambiguous terms in a partnership agreement that was drafted only by the general partner should be construed against the general partner under the principle of *contra proferentem* ); *Penn Mut. Life Ins. Co. v. Oglesby*, 695 A.2d 1146, 1149–50 (Del.1997) ("It is the obligation of ... the issuer of securities to make the terms of the operative document understandable to a reasonable investor whose rights are affected by the document. Thus, if the contract in such a setting is ambiguous, the principle of *contra proferentem* dictates that the contract must be construed against the drafter."); *see also Stockman v. Heartland Indus. Partners, L.P.*, 2009 WL 2096213, at *5 (Del.Ch. July 14, 2009) (noting that when an entity's organizing document is ambiguous and "makes promises to parties who did not participate in negotiating the agreement," Delaware courts apply the principle of *contra proferentem* ).

19. *Kaiser*, 681 A.2d at 398–99.

20. *Id.; In re Appraisal of Ford Holdings, Inc. Preferred Stock*, 698 A.2d 973, 978 (Del.Ch. 1997).

21. *Kaiser*, 681 A.2d at 399.

22. *Rothschild Int'l Corp. v. Liggett Group Inc.*, 474 A.2d 133, 136 (Del.1984) ("Stock preferences must ... be clearly expressed and will not be presumed."); *Waggoner v. Laster*, 581 A.2d 1127, 1135 (Del.1990) (stating that "stock preferences ... must be strictly construed" and "[u]nder the rule of strict construction, any ambiguity [in the relevant certificate] must be resolved against granting the challenged preferences, rights or powers" of preferred stock.); *see also Baron v. Allied Artists Pictures Corp.*, 337 A.2d 653, 657 (Del. Ch.1975) (noting that "preferences attaching to stock are the exception and are to be strictly construed.").

23. 715 A.2d 843 (Del.1998).

ambiguity attributable to the corporate drafter that could mislead a reasonable investor such ambiguity must be construed in favor of the reasonable expectation of the investor and against the drafter.[24]

One could argue that these interpretative principles come into direct conflict in a very particular context. Imagine a situation where preferred stockholders argue that a certificate of designation can be reasonably read to grant a particular preference. The court agrees, but also agrees with the corporation that the relevant provision in the certificate is not clear. There is no parol evidence on the subject. Do the preferred stockholders win because of *contra proferentem?* Or does the corporation win because preferences of preferred stock "will not be presumed" [25] unless they are clearly expressed in the certificate?

■ The parties have not shed useful light on this problem, which I believe could be side-stepped here even if the Certificate were ambiguous because this is a rare context where probative extrinsic evidence does exist. The principle that the preferences of preferred stockholders must not be presumed, but rather be clearly expressed, does not, it seems to me, prevent a court from consulting parol evidence, if that is available. *Avatex* itself seems to require this resolution, as it suggested that the prior decision of *Waggoner v. Laster,* which identified "strict construction" as the analytical methodology for interpreting stock preferences, was problematic.[26] *Avatex,* and cases like *Kaiser,* which did not mention any requirement of strict construction, therefore suggest to me that this disciplinary principle of narrow interpretation of stock preferences is not intended to blind a court to all relevant evidence, but instead to prevent the judiciary from implying or presuming preferences without a clear basis for doing so.[27] In other words, unless the parol evidence resolves the ambiguity with clarity in favor of the preferred stock, the preferred stockholders

---

24. *Id.* at 852–53.

25. *Rothschild,* 474 A.2d at 136.

26. *Avatex,* 715 A.2d at 853 n. 46 (noting that the Supreme Court continued to approve the holding in *Waggoner,* but did not "approve the continued use of the term 'strict construction' as appropriately describing the judicial process of analyzing the existence and scope of the contractual statement of preferences in certificates of incorporation or certificates of designation.").

27. *Cf. Harrah's Entm't, Inc. v. JCC Holding Co.,* 802 A.2d 294, 309–13 (Del.Ch.2002). In *Harrah's,* this court considered the interplay between the availability of extrinsic evidence and a rule of construction similar to the policy principle against reading stock preferences broadly. In *Harrah's,* that was the interpretive principle that "when a corporate charter is alleged to contain a restriction on the fundamental electoral rights of stockholders under default provisions of law ... the restriction must be 'clear and unambiguous' to be enforceable." *Id.* at 310 (quoting *Centaur Partners, IV v. Nat'l Intergroup, Inc.,* 582 A.2d 923, 927 (Del.1990)). The court addressed the question of how to apply that rule of construction favoring the free exercise of franchise rights when relevant parol evidence bearing on the intentions of both the drafter and the stockholders was available, finding that it was hard to read prior cases "as cutting off a review of extrinsic evidence" in that context. *Harrah's,* 802 A.2d at 312. The court concluded that the rule of construction should apply as a "deadlock breaker" that applied *after* a full review of all admissible evidence. *Id.* at 312–13. Put otherwise, if an alleged restriction on franchise rights in a corporate charter is ambiguous and there is parol evidence that can be properly considered, under the analytical methodology articulated in *Harrah's,* the court should "interpret the contract in the manner that is the least restrictive of electoral rights," unless there is "clear and convincing" extrinsic evidence in support of the restriction. *Id.* at 311–12.

should lose.[28]

With these interpretative principles in mind, I will now discuss why I believe the petitioners' interpretation is the correct one.

A review of the plain language of the Certificate demonstrates that, by relying on § B(5)(c), Morgan Joseph is straining to create an ambiguity when in fact there is none. As the petitioners point out, there was no reference to "Excess Cash" in § B(5)(a), which was the logical place in which to impose such a requirement. Such a restriction would also have been symmetrical with how the Excess Cash condition was applied to Optional Redemptions. Optional Redemptions were addressed in § B(5)(b) of the Certificate, and they were expressly and directly conditioned on the availability of Excess Cash.

In the Merger that gave rise to the petitioners' appraisal rights, the consideration that was offered to the petitioners and other Series A holders was new Series A Preferred Stock subject to a new certificate of incorporation. In that new certificate, § B(5)(a) of the old Certificate was changed to subject Automatic Redemptions of the new Series A to an Excess Cash requirement explicitly.[29] Thus, Morgan Joseph's own undisputed conduct suggests that the logical place to impose an Excess Cash limitation on Automatic Redemptions would have been in § B(5)(a).

The plain language of the Certificate does not indicate that the Automatic Redemption provision in § B(5)(a) would be, as Morgan Joseph contends, subject to the distribution scheme set forth in § B(5)(c). Section B(5)(c) contained instructions for redeeming the Series A Preferred Stock in the event that either an Automatic Redemption or Optional Redemption took place. The first sentence of § B(5)(c), which defined "Redemption Date," clearly and unambiguously applied to both types of redemptions. This makes sense because both an Automatic Redemption and Optional Redemptions would require an effective date. But, the sentence of § B(5)(c) that detailed the distribution scheme in the event that Morgan Joseph did not have enough Excess Cash to go around applied only to Optional Redemptions. Morgan Joseph points to the beginning of this sentence, which stated, "[i]f the Excess Cash legally available for redemption . . . on *any Redemption Date,*"[30] and argues that the word "any" means that the distribution scheme applied to both types of redemptions, and that this was intended as a way to subject Automatic Redemptions, like Optional Redemptions, to an Excess Cash requirement. This does not strike me as a reasonable reading. The reasonable interpretation,

---

28. I admit to having a harder time reconciling the interpretive principles juxtaposed in *Avatex* when no parol evidence is available, as is more typically the case in these contexts. If a certificate can be read to either give special rights to the preferred stock or not to do so, who wins? Making this decision more difficult is the fact that other investors rely on the certificate and other publicly available documents describing the certificate, and granting rights to the preferred stock on the basis of an ambiguous certificate could disrupt the reasonable expectations of the other investors.

29. First Burton Aff. Ex. 1 at 4. Specifically, Article FOURTH, § B(5)(a) of the new certificate of incorporation now provides: "All outstanding shares of Series A Preferred Stock shall (*to the extent of Excess Cash* . . .) legally available for redemption of the outstanding shares of Series A Preferred Stock on any Series A Redemption Date . . . be automatically and mandatorily redeemed by the Corporation . . . upon the earlier to occur of any of the [triggering events]." *Id.* (emphasis added).

30. Certificate § B(5)(c) (emphasis added).

by contrast, is that the reference to "any Redemption Date" was just a measuring rod (the when) for Optional Redemptions, which could come in at a variety of times due to the requests of different Series A holders. The sentence describing pro rata distributions did not turn Automatic Redemptions into Optional Redemptions subject to the Excess Cash pre-condition set forth in § B(5)(b). Rather, it simply explained how an Optional Redemption would work in the event that there was not enough Excess Cash to satisfy all demands.

Further, Morgan Joseph fails to address the obvious categorical difference between the triggering events for Automatic Redemptions and for Optional Redemptions that emerges from the face of the Certificate. Under the Certificate, an Automatic Redemption would be triggered largely by strategic events—a sale of substantially all assets, an initial public offering, or a merger in which Morgan Joseph was not the survivor. These are the sort of benchmark events that commonly trigger the right of a preferred security holder to receive a preference return based on its place in the capital hierarchy.[31] In colloquial terms, these are harvest events. It is evident that July 1, 2011 was also such a harvest event, and was chosen consciously. The Series A Preferred Stock was issued exactly ten years before July 1, 2011. The only reasonable way to read the Certificate was that the Series A holders were entitled to an Automatic Redemption upon the occurrence of any of the harvest triggers listed in § B(5)(a) of the Certificate, and at the latest on July 1, 2011, ten years after their investment was made. This right to an Automatic Redemption was not subject to any Excess Cash requirement; rather, payment was due to the Series A holders as the senior security holders so long as the company had legally available funds to make the redemption.[32] In other words, the Series A holders, as holders of senior preferred securities, were entitled to harvest their investment at the latest after ten years were up. By contrast, the Series A holders could only exercise their right to

---

**31.** *See* National Venture Capital Association ("NVCA") Model Term Sheet, at 2–3, *available at* http://www.nvca.org/index.ph p?option=com_content&view=article&id=108&Itemid=136 (last visited Jan. 12, 2012) ("A merger or consolidation (other than one in which stockholders of the Company own a majority by voting power of the outstanding shares of the surviving or acquiring corporation) and a sale, lease, transfer, exclusive license or other disposition of all or substantially all of the assets of the Company will be treated as a liquidation event (a "Deemed Liquidation Event"), thereby triggering payment of the liquidation preferences described above [unless the holders of [——]% of the Series A Preferred elect otherwise]. [The Investors' entitlement to their liquidation preference shall not be abrogated or diminished in the event part of the consideration is subject to escrow in connection with a Deemed Liquidation Event].") (brackets in original); *see also* NVCA Model Certificate of Incorporation § 2.3, *available at* http://www.nvca.org/index.ph p?option=com_content&view=article&id=108&Itemid=136 (last visited Jan. 12, 2012) (similarly defining "Deemed Liquidation Event"); Joseph W. Bartlett et al., *Advanced Private Equity Term Sheets and Series A Documents* § 3.07 ("Series A Preferred: Model Certificate of Designation"), at 3–168 (2003) ("The merger or consolidation of the Company into or with another corporation which results in the exchange of outstanding shares of the Company for securities or other consideration issued or paid or caused to be issued or paid by such other corporation or an affiliate thereof (except if such merger or consolidation does not result in the transfer of more than 50 percent of the voting securities of the Company), or the sale of all or substantially all the assets of the Company, shall be deemed to be a liquidation, dissolution or winding up of the Company for purposes of this Section....").

**32.** *See* 8 *Del. C.* § 160.

an Optional Redemption if Morgan Joseph was sufficiently in the plush with Excess Cash.

Under Morgan Joseph's strained reading of the reference to "any Redemption Date" in what is the penultimate sentence in § B(5)(c) of the Certificate, the careful categorization set up by §§ B(5)(a) and B(5)(b) between Automatic Redemptions, on the one hand, and Optional Redemptions, on the other, would have been eradicated by an incredible linguistic bank shot. Such linguistic bank shots might be employed occasionally by novelists striving to be seen as deserving of the appellation "a writer of literary fiction." No reasonable contract drafter would have used that sentence of § B(5)(c)—a subsection dealing with the mechanics for effecting redemptions—to subject the category of Automatic Redemptions set forth in § B(5)(a) to the same substantive Excess Cash requirement that the drafter had explicitly and directly, rather than implicitly and obliquely, subjected Optional Redemptions to in § B(5)(b). Such an inconsistent use of obliqueness would have served no evident drafting purpose. Put simply, the Certificate can only be reasonably read in the manner the petitioners suggest.

Even if the Certificate were ambiguous, the parol evidence makes clear that the petitioners' interpretation is indisputably correct. The petitioners submitted evidence that shows the shared beliefs of the parties at the time that Morgan Joseph sold its Series A Preferred Stock: the Information Material used by Morgan Joseph to market the Series A to investors. Because Morgan Joseph drafted the Information Material and put it into circulation, it is strong evidence of what Morgan Joseph believed when it authored the Certificate. Most important, because the Information Material was used as advertising to

the buyers of the Series A Preferred Stock, it speaks to the reasonable expectations of the Series A investors. For these reasons, the Information Material is very powerful parol evidence that may be properly considered by the court. Moreover, Morgan Joseph has failed to advance any contradictory parol evidence or explain through a Rule 56(f) affidavit how discovery would generate admissible parol evidence.

The Information Material summarized the provisions of the Certificate that addressed the redemption rights of the Series A Preferred Stock, and its descriptions of these provisions accord with the petitioners' interpretation of the relevant language. For example, the Information Material discussed the pro rata distribution scheme contemplated by § B(5)(c) only in its description of the terms of Optional Redemptions. It described Automatic Redemptions separately, and that description, like the provision in § B(5)(a) of the Certificate, did not suggest in any way that Automatic Redemptions were subject to an Excess Cash requirement or that the waterfall provisions applicable to Optional Redemptions under § B(5)(c) when Excess Cash is lacking applied at all to Automatic Redemptions. The summary of the distribution scheme was also prefaced in the Information Material by the words "[i]f the amount of cash available *for Optional Excess Cash Redemptions* . . . is not sufficient for all Preferred Shareholders seeking to redeem. . . ."[33] This description shows that the Excess Cash requirement was meant to apply only to Optional Redemptions, and not to Automatic Redemptions.

The Information Material also supports a reading of the July 1 Automatic Redemption as a harvest event for the holders of the Series A Preferred Stock. It described the July 1 Automatic Redemption

**33.** First Burton Aff. Ex. 3 at 6 (emphasis added).

in a stand-alone section, entitled "Redemption At Maturity." [34] The title of this description, along with the fact that the Information Material separates out the July 1 Automatic Redemption from its description of other events triggering an Automatic Redemption, shows that the July 1 Automatic Redemption was presented to the investors in the Series A Preferred Stock as the definite last date on which they had a firm right to exit their investment—an exit opportunity not contingent on the existence of Excess Cash.

For all these reasons, the Series A would have had a right to an Automatic Redemption on July 1, 2011 that was not subject to the existence of Excess Cash, but would have had to be paid to the extent the company had legally available funds.

**B.** *The July 1 Automatic Redemption Is Relevant To The Court's Determination Of Fair Value In An Appraisal Proceeding*

■ Under 8 *Del. C.* § 262, my task in an appraisal proceeding is to "determine the fair value *of the shares* exclusive of any element of value arising from the accom-

plishment or expectation of the merger or consolidation," taking into account "all relevant factors." [35] Not only that, our Supreme Court has required this court to take into account all non-speculative information bearing on the value of the shares at issue in an appraisal. [36]

Applied here, that means that when the court values the Series A Preferred Stock, it must take into account the economic reality that the Series A would have been entitled to a mandatory redemption on July 1, 2011, just six months after the Merger. The ability of the Series A holders to receive the full $100 per share on July 1, 2011 would of course have depended on whether Morgan Joseph had sufficient legally available funds to effect the redemption, but that specific, non-speculative contractual right was inarguably an important economic factor bearing on the value of the Series A as of the Merger date that any reasonable investor or market participant would have taken into account. [37]

■ It is by no means unusual to recognize that the value of preferred stock often depends materially on its contractual fea-

34. *Id.* at 5.

35. 8 *Del. C.* § 262(h) (emphasis added).

36. *Weinberger v. UOP*, 457 A.2d 701, 713 (Del. 1983).

37. Because July 1, 2011 was unquestionably an event triggering Automatic Redemption under the Certificate, this case is distinguishable from *In re Appraisal of Metromedia International Group, Inc.*, 971 A.2d 893 (Del.Ch. 2009), a case relied upon by Morgan Joseph in arguing that the July 1 Automatic Redemption cannot be considered for appraisal purposes. *Metromedia* was an appraisal action brought by dissenting preferred stockholders of Metromedia International Group, Inc. The preferred shares held by the *Metromedia* petitioners had, under the relevant certificate of designation, a liquidation preference of $50 per share, and Metromedia had the right to redeem each preferred share at $50 per

share. The petitioners asked the court to award an appraisal value that was based on "what preferred holders would have been entitled to had their stock been redeemed or had there been a liquidation event," arguing that the redemption of the preferred shares would occur in three to five years because the private equity buyer of Metromedia would probably seek to exit its investment within that time frame. *Id.* at 904–05. The court rejected this argument. Chancellor Chandler found that the petitioners' assumption was "speculative in that it assumes the probability of a future event, that is not certain to occur, and that has not occurred as of the appraisal date." *Id.* at 905. Chancellor Chandler noted that the certificate of designation did not "contemplate the probability of future events," and that the likelihood of redemption of the preferred stock occurring seemed remote, was "at least speculative," and was not supported by the certificate of designation.

tures. As a general rule, preferred stock has the same appraisal rights as common stock, but "[u]nlike common stock, the value of preferred stock is determined solely from the contract rights conferred upon it in the certificate of designation." [38] Therefore, when determining the fair value of preferred stock, the court must consider the contract upon which the preferred stock's value was based.[39]

■ At the trial stage, therefore, this court will have to perform two related, but discrete tasks. It will have to value Morgan Joseph under the standards applicable in appraisals. This means that I will have to determine the fair value of Morgan Joseph as a going concern as of the Merger date.[40] But the percentage of that entity value that should be awarded to the Series A Preferred Stock must, as a matter of legal and economic reality, take into account the legal right of the Series A holders to the July 1 Automatic Redemption.[41] This works no harm to the other equity holders, as that is what you sign up for when you invest in a company with senior security holders entitled to specific preferred rights with economic value, or to Morgan Joseph, which chose to effect the Merger knowing that it had different series of stock with differing contractual claims on the company's value.

## IV. Conclusion

For the foregoing reasons, the petitioners' motion for partial summary judgment is GRANTED. IT IS SO ORDERED.

---

*Id.* Thus, the "untriggered" redemption right of the preferred stock offered no non-speculative basis on which the court was able to responsibly rely in an appraisal action. *Id.* at 906.

Here, there is no question about the probability that an event triggering an Automatic Redemption under the Certificate would have taken place. The July 1 Automatic Redemption, although untriggered because the Merger took place before that date, had to occur on July 1, 2011, a mere six months after the Merger. Thus, the redemption right in controversy here, in contrast to the redemption right at issue in *Metromedia*, was not in any way contingent on other factors.

**38.** *Metromedia*, 971 A.2d at 900.

**39.** *See id.* In fact, the certificate governing a series of preferred stock may preempt the rights of the preferred stockholders to appraisal. *See In re Appraisal of Ford Holdings, Inc. Preferred Stock,* 698 A.2d 973, 978 (Del. Ch.1997) (when the terms of preferred stock "clearly describe[d] an agreement between the [preferred stockholders] and the company regarding the consideration to be received" by the stockholders in the event of a specific type of merger, and that specific type of merger occurred, the stockholders were *deemed to* have waived their appraisal rights and were only entitled to the compensation provided for in the governing certificate). Here, unlike the preferred stockholders in *Ford*, the Series A holders have not *waived their right to ap-praisal*—the $100 per share Liquidation Preference was clearly *not* triggered by the Merger. But, that does not render the July 1 Automatic Redemption irrelevant to the appraisal analysis. It is still a non-speculative contractual feature that must be taken into account in the court's determination of fair value.

**40.** *See, e.g., Cavalier Oil Corp. v. Harnett,* 564 A.2d 1137, 1144 (Del.1989) (stating that, in an appraisal proceeding, "the company must be first valued as an operating entity by application of traditional value factors, weighted as required, but without regard to post-merger events or other possible business combinations.").

**41.** It is common for experts in appraisals of common stock to have to deduct the value of the preferred stock before coming to a value of the common shares. Just like the claims of debt holders, the claims of the holders of senior preferred securities come before those of the common stockholders if that is what the relevant corporate contract requires.