SUPERIOR COURT
OF THE
STATE OF DELAWARE

E. SCOTT BRADLEY
JUDGE

1 The Circle, Suite 2
GEORGETOWN, DE 19947

December 22, 2017

Daniel F. McAllister, Esquire
Aaron C. Baker, Esquire
Baird Mandalas Brockstedt, LLC
6 South State Street
Dover, DE 19901

Daniel C. Herr, Esquire
Law Office of Daniel C. Herr, LLC
1225 N. King Street, Suite 1000
Wilmington, DE 19801

> RE: *Orthopaedic Associates of Southern Delaware, P.A., v. William L. Pfaff, III, and Lewes Spine Center, LLC, and Corie L. Wingate*
> **C.A. No. S17C-07-016 ESB**

Dear Counsel:

This is my decision on Defendant William L. Pfaff, III's Motion to Dismiss

Counts I and III of the Amended Complaint filed against him by Plaintiff Orthopaedic

Associates of Southern Delaware, P.A. ("OASD").[1]    OASD is a Delaware

professional association which owns and operates a medical practice providing

medical and surgical care at five locations throughout Sussex County, Delaware.  Dr.

Pfaff is a physician who was employed by OASD for a number of years until he left

on April 30, 2017.  Dr. Pfaff then formed the Lewes Spine Center, LLC, on May 5,

2017.  OASD alleges that (1) Dr. Pfaff violated his obligation not to compete with

---

[1] Count III alleges multiple violations of one agreement.  Dr. Pfaff's Motion seeks dismissal of only one of the violations. Specifically, Dr. Pfaff seeks dismissal of paragraphs 36 and 37 of Count III which allege that Dr. Pfaff disparaged OASD after he left.

OASD by forming the Lewes Spine Center, and (2) Dr. Pfaff disparaged OASD when he contacted his former patients and others after leaving OASD. Dr. Pfaff argues that his obligation not to compete with OASD terminated when he entered into a new agreement with OASD that had no such obligation and that he did not disparage OASD after he left. At issue in Dr. Pfaff's motion is the enforceability and integration of two employment agreements and a separation agreement entered into between Dr. Pfaff and OASD. I have concluded that Dr. Pfaff had no obligation not to compete with OASD after he left and that OASD has adequately pled, in part, that Dr. Pfaff disparaged it after he left.

## STATEMENT OF THE FACTS[2]

### A. The 2014 Agreement[3]

On January 1, 2014, OASD and Dr. Pfaff entered into an employment agreement (the "2014 Agreement") whereby, among other things, OASD agreed to employ Dr. Pfaff as a physician in exchange for other rights and benefits set forth in the 2014 Agreement. The 2014 Agreement also made Dr. Pfaff a shareholder in OASD. The 2014 Agreement contains a post-termination restrictive covenant. In

---

[2] The facts are based on the Amended Complaint and the attachments to it.

[3] The 2014 Agreement is titled "Orthopaedic Associates of Southern Delaware, P.A., Employment Agreement" and consists of 13 pages containing 28 numbered paragraphs and two attachments.

particular, the restrictive covenant stated that Dr. Pfaff:

> "shall not during the term of this Agreement and for a period of one (1) year after its termination for any other reason without the express written consent of the Corporation, which may be withdrawn at any time upon ninety (90) days' written notice by Corporation, directly or indirectly, in whole or in part, own, manage, operate, join, control, participate in the ownership, management, operation or control of, contract with, be employed by, or be connected with any manner, any entity or business which is a competitor of Corporation or to which the Corporation provides medical services and/or any entity or business within a radius of twenty-five (25) miles of Lewes, Ocean View, Millsboro, and Milford or any other satellite offices or Healthcare Facilities to which the Corporation provides medical services."[4]

The initial term of the 2014 Agreement was from January 1, 2014 through December 31, 2014. It then continued from year to year until terminated. OASD and Dr. Pfaff terminated the 2014 Agreement on February 28, 2017.

**B. The 2017 Agreement[5]**

On March 1, 2017, OASD and Dr. Pfaff entered into a new employment agreement (the "2017 Agreement") whereby, among other things, OASD agreed to employ Dr. Pfaff as a physician in exchange for other rights and benefits set forth in the 2017 Agreement. The 2017 Agreement reflected Dr. Pfaff's status at that time solely as a physician of OASD, and not as a shareholder/physician as he was under

---

[4] 2014 Agreement, paragraph 8(a).

[5] The 2017 Agreement is titled "Orthopaedic Associates of Southern Delaware, P.A, Physician Employment Agreement" and consists of 11 pages containing 28 numbered paragraphs.

3

the 2014 Agreement. Upon termination of the 2017 Agreement, the 2017 Agreement prohibited Dr. Pfaff from soliciting or hiring employees of OASD but, by its own terms, did not prohibit Dr. Pfaff from competing with OASD. This is in contrast to the 2014 Agreement. Specifically, the 2017 Agreement stated that:

> "upon termination of this agreement, Physician shall not, directly or indirectly, during any portion of the Term or the two (2) year period immediately after the end of the Term solicit, employ or otherwise engage as an employee, independent contractor or otherwise, any person who is or was an employee or independent contractor of Employer at any time during the Term or in any manner induce or attempt to induce any such employee or independent contractor of Employer to terminate his or her employment or engagement as such with Employer."[6]

The 2017 Agreement also contained a provision that states "this Agreement contains the entire understanding and agreement between the parties with respect to the subject matter hereof and supercedes all prior agreements and understandings between the parties with respect to such subject matter."[7] The 2017 Agreement did not mention the 2014 Agreement. OASD and Dr. Pfaff terminated the 2017 Agreement on May 5, 2017.

**C. The Separation Agreement**

On May 17, 2017, OASD and Dr. Pfaff entered into a Separation Agreement and General Release. According to the Separation Agreement, OASD and Dr. Pfaff:

---

[6] 2017 Agreement, paragraph 9(f).

[7] 2017 Agreement, paragraph 24.

4

"mutually agree[d] to terminate the employment relationship in accordance with the terms in the March 1, 2017 Employment Agreement between Pfaff and OASD ("Employment Agreement"). The respective post-termination obligations of the parties shall remain in effect, except to the extent they conflict with the terms of this Agreement, and except as follows: a. Pfaff's obligations under the non-solicitation clause in Paragraph 9(f) remain in effect, with the exception that upon starting a new practice, Pfaff may hire Physician Assistants Corie Wingate and Pamela Schweiger (contingent upon their agreement thereto and four weeks' notice to OASD)."[8]

The Separation Agreement also contains a "non-disparagement" clause. The non-disparagement clause states:

"the parties agree not to make any oral or written communication to any person or entity which disparages, or has the effect of damaging the reputation of, or otherwise working in any way to the detriment of, the other party, except as required by local, state or federal law. In view of the difficulty of determining and calculating the amount of damages that may result from a violation of this Section 10, each party agrees to pay to the other $1,000 as liquidated damages, and not as a penalty, for each and every violation of this Section."[9]

The Separation Agreement also has an "entire agreement clause". It states:

"this Agreement contains the entire agreement between the parties, and shall be governed by the laws of the State of Delaware. This Agreement may not be changed orally, but only by an agreement in writing signed by the party against whom enforcement of any waiver, change, modification or discharge is sought. The parties attest that no other representations were made regarding this Agreement other than those contained herein and that this agreement represents the entirety of the

---

[8] Separation Agreement, paragraph 3.

[9] Separation Agreement, paragraph 11.

5

agreement between the parties."[10]

The Separation Agreement does not refer to the 2014 Agreement.

## D. Additional Facts

Dr. Pfaff formed the Lewes Spine Center, LLC, on May 5, 2017. The Lewes Spine Center operates a medical practice in Georgetown, Delaware. Dr. Pfaff is the sole owner and member of the Lewes Spine Center. On or about June 2, 2017, Dr. Pfaff sent a letter ("June letter") to his former patients announcing his new medical practice. OASD alleges that Dr. Pfaff sent his June letter to no less than 1,100 patients of OASD and to as many as 1,300 patients. The June letter states:

> Dear Patient,
> As you are likely aware by this point, I am no longer associated with Orthopaedic Associates of Southern Delaware. Unfortunately, my departure was sudden and unexpected. In this day and age, medicine has become a business and in this instance the business of medicine obstructed me from continuing to treat you at my prior practice.
> Since I last saw you, I have been diligently working to set up a new practice in order to continue to care for you and your family members. I will begin seeing patients in a satellite office in Georgetown starting in mid-June. I am also setting up an office in Lewes which will not be completed for another month or so.
> I understand you likely were referred to another physician and may or may not be satisfied with that provider. I would like to convey to you that I am deeply sorry for the inconvenience and disruption; but, this was out of my control and affected me as well. I would like to continue your care if you are interested or in need.
> Upon receipt of this letter, you may call and make an

---

[10] Separation Agreement, paragraph 20.

appointment. I hope you will allow me to continue to provide spine care to you as I miss being your provider and I am looking forward to continuing to treat all of my patients.

> Sincerely,
> Dr. Pfaff

On June 2, 2017, Dr. Pfaff wrote to a colleague that:

> "I established the "Lewes Spine Center, LLC"... my plan ... get back in the ring and get my title back."
> "Oh, Did I say crush OASD."
> "I'm sure you have been seeing many of my prior patients so I wanted to update you. Today, I am sending out 1,100 letters to my prior patients. I will start seeing patients this month in a satellite office in Georgetown. I am bidding on an office space in Kings Row, Lewes."

OASD also alleges that, based upon information it has received from third-parties, on or after May 17, 2017, Dr. Pfaff made oral or written statements to other persons which disparaged OASD.

## STANDARD OF REVIEW

The standards for a Rule 12(b)(6) motion to dismiss are clearly defined. The Court must accept all well-pled allegations as true.[11] The Court must then determine whether a plaintiff may recover under any reasonable set of circumstances that are susceptible of proof.[12] When deciding a motion to dismiss, the Court accepts as true all well-pleaded allegations in the complaint, and draws all reasonable inferences in

---

[11] *Spence v. Funk*, 396 A.2d 967, 968 (Del. 1978).

[12] *Id.*

7

favor of the plaintiff.[13] As a general rule, when deciding a Rule 12(b)(6) motion, the Court is limited to considering only the facts alleged in the complaint and normally may not consider documents extrinsic to it. There are two exceptions, however, to this general rule.[14] "The first exception is when the document is integral to a plaintiff's claim and incorporated into the complaint. The second exception is when the document is not being relied upon to prove the truth of its contents."[15] "Where allegations are merely conclusory, however, (*i.e.*, without specific allegations of fact to support them) they may be deemed insufficient to withstand a motion to dismiss."[16] Dismissal will not be granted if the complaint "gives general notice as to the nature of the claim asserted against the defendant."[17] A claim will not be dismissed unless it is clearly without merit, which may be either a matter of law or fact.[18] Vagueness or lack of detail in the pleaded claim are insufficient grounds upon which to dismiss

---

[13] *Ramunno v. Crawley*, 705 A.2d 1029 (Del. 1998).

[14] See *Vanderbilt Income & Growth Assocs., L.L.C., v. Arvida/JMB Managers, Inc.*, 691 A.2d 609, 612 (Del. 1996).

[15] *Vanderbilt*, 691 A.2d at 613.

[16] *Lord v. Souder*, 748 A.2d 393, 398 (Del. 2000).

[17] *Diamond State Telephone v. University of Delaware*, 269 A.2d 52, 58 (Del. 1970).

[18] *Id.*

8

a complaint under Rule 12(b)(6).[19]  If there is a basis upon which the plaintiff may recover, the motion is denied.[20]

## DISCUSSION

### I. Alleged Breach of the 2014 Agreement (Count I)

OASD alleges in the Amended Complaint that Dr. Pfaff breached the 2014 Agreement by forming the Lewes Spine Center, and engaging in, managing, joining, and owning a medical practice in Georgetown, Delaware, in direct competition with OASD.  OASD argues that the 2017 Agreement was not intended to discharge or release the parties' post-termination obligations contained in the 2014 Agreement.  Dr. Pfaff argues that the 2014 Agreement was not in effect at the time he formed the Lewes Spine Center, reasoning that the 2014 Agreement was superceded by the 2017 Agreement.

The 2014 Agreement covers Dr. Pfaff's role as a shareholder and physician in OASD with a corresponding compensation structure reflecting his dual role as shareholder and physician.  Upon termination of the 2014 Agreement between OASD and Dr. Pfaff, the 2014 Agreement states that Dr. Pfaff cannot  "own, manage, operate, join, control, participate in the ownership, management, operation or control

---

[19] *Id.*

[20] *Id.*

9

of, contract with, be employed by, or be connected with any manner, any entity or business which is a competitor of Corporation..."[21]  OASD and Dr. Pfaff terminated the 2014 Agreement on February 28, 2017.  Dr. Pfaff formed the Lewes Spine Center on May 5, 2017.  Thus, Dr. Pfaff established a new medical practice in a location that directly competes with OASD within one year of terminating the 2014 Agreement. Accordingly, Dr. Pfaff would be in violation of the non-compete provision of the 2014 Agreement if the 2014 Agreement survives the 2017 Agreement and Separation Agreement.

On March 1, 2017, OASD and Dr. Pfaff entered into the 2017 Agreement.  The 2017 Agreement covers Dr. Pfaff's role strictly as a physician for OASD and not as a shareholder.  This is also reflected in the compensation structure of the 2017 Agreement.  The "Terms of Agreement" of the 2017 Agreement state, in part, "if either party decides to terminate employment, *then stated termination rules apply, as defined in this contract agreement*." (Emphasis added).[22]  Of note, there is no mention of the 2014 Agreement in the "Terms of Agreement" or anywhere else in the 2017 Agreement.  The "Termination of Agreement" is discussed under the ninth numbered paragraph of the 2017 Agreement.  Paragraph 9(f) states "upon termination

---

[21] 2014 Agreement, paragraph 8(a).

[22] 2017 Agreement, paragraph 1.

of this agreement, Physician shall not, directly or indirectly, during any portion of the Term or the two (2) year period immediately after the end of the Term solicit, employ or otherwise engage as an employee, independent contractor or otherwise, any person who is or was an employee or independent contractor of Employer at any time during the Term or in any manner induce or attempt to induce any such employee or independent contractor of Employer to terminate his or her employment or engagement as such with Employer." The 2017 Agreement does not prohibit Dr. Pfaff from competing with OASD. Interestingly, the only prohibition stated is that Dr. Pfaff is not allowed to employ, for a term of two years, any former or current employees of OASD. If the 2017 Agreement is controlling, then Dr. Pfaff was not in violation of it by forming the Lewes Spine Center. OASD and Dr. Pfaff terminated the 2017 Agreement on May 5, 2017.

On May 17, 2017, OASD and Dr. Pfaff jointly signed the Separation Agreement. According to the Separation Agreement, OASD and Dr. Pfaff:

> "mutually agree[d] to terminate the employment relationship *in accordance with the terms in the March 1, 2017 Employment Agreement between Pfaff and OASD ("Employment Agreement").* (Emphasis added). The respective post-termination obligation of the parties shall remain in effect, except to the extent they conflict with the terms of this Agreement, and except as follows: a. Pfaff's obligation under the non-solicitation clause in Paragraph 9(f) remain in effect, with the exception that upon starting a new practice, Pfaff may hire Physicians Assistants Corie Wingate and Pamela Schweiger (contingent upon their agreement thereto and four weeks' notice to OASD)."

11

The Separation Agreement does not prohibit Dr. Pfaff from competing with OASD. The Separation Agreement does specifically mention the 2017 Agreement. It provides that OASD and Dr. Pfaff were terminating Dr. Pfaff's employment relationship with OASD pursuant to the terms of the 2017 Agreement. The Separation Agreement does not mention the 2014 Agreement. The only reference in the Separation Agreement to the subject matter of the 2014 Agreement is paragraph 7 where OASD agreed to provide monthly reports to Dr. Pfaff for the period of time from January 1, 2014 through February 28, 2017. Presumably, this would allow Dr. Pfaff to calculate the amount of money that OASD owed him for work that he had done but had not been paid for. Additionally, the Separation Agreement specifically changes the terms of paragraph 9(f) of the 2017 Agreement. The Separation Agreement allowed Dr. Pfaff to hire two physician assistants employed by OASD contingent upon them providing four weeks' notice to OASD. Paragraph 20 of the Separation Agreement also states that the Separation Agreement "contains the entire agreement between the parties..." In summary, the 2017 Agreement and Separation Agreement do not prohibit Dr. Pfaff from competing with OASD and allow him to hire physician assistants Corie Wingate and Pamela Schweiger on four weeks' notice upon starting a new medical practice.

<u>The Applicable Law</u>

The issue raised in this Motion to Dismiss is one of contractual interpretation. The proper construction of a contract is a question of law for this Court.[23] When interpreting a contract, the Court gives priority to the parties' intentions as reflected in the four corners of the agreement.[24] If the contractual language at issue is clear and unambiguous, it must be accorded its plain meaning.[25] Ambiguity exists "when the provisions in controversy are reasonably or fairly susceptible of different interpretations."[26] A contract is not ambiguous merely because the parties disagree about its proper construction.[27] Extrinsic evidence "may not be used to interpret the intent of the parties, to vary the terms of the contract[,] or to create an ambiguity," if the contract is unambiguous.[28] On a motion to dismiss, "a trial court cannot choose between two differing reasonable interpretations of ambiguous documents."[29]

---

[23] *Rhone -Poulenc Basic Chems. Co., v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del. 1992).

[24] *Paul v. Deloitte & Touche, LLP*, 974 A.2d 140, 145 (Del. 2009).

[25] *Phillips Home Builders v. Travelers Ins. Co.*, 700 A.2d 127, 129 (Del. 1997).

[26] *Kaiser Aluminum Corp. v. Matheson*, 681 A.2d 392, 395 (Del .1996).

[27] *Rhone-Poulenc*, 616 A.2d at 1196.

[28] *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997).

[29] *Vanderbilt Income & Growth Assocs., LLC, v. Arvida/JMB Managers, Inc.*, 691 A.2d 609, 613 (Del. 1996).

Clauses indicating that the contract is a expression of the parties' final intentions generally create a presumption of integration.[30] "An integrated agreement is a writing or writings constituting a final expression of one or more terms of an agreement."[31] An integration clause is not irrebuttable, however, because the parties' intent always controls.[32] A court therefore must "consider the facts and circumstances surrounding the execution of the instrument" to discern whether the contract is fully integrated, or partially integrated.[33] Factors relevant to that consideration include: (i) the parties' intent, to the extent it is discernable, (ii) the language of the contract, including any integration clause, (iii) whether the contract was carefully and formally drafted, (iv) the time the parties had to consider the contract's terms, (v) whether the parties bargained over specific terms, and (iv) whether the contract "addresses questions that naturally arise out of the subject matter."[34] A contract is completely integrated if on its face it is clear that the parties intended the writing to be a final and

---

[30] *Addy v. Piedmonte,* 2009 WL 707641, at *9 (Del. Ch. Mar. 18, 2009).

[31] Restatement (Second) of Contracts § 209(1)(1981).

[32] *MicroStrategy Inc., v. Acacia Research Corp.*, 2010 WL 5550455, at *13 (Del. Ch. Dec. 30, 2010).

[33] *Carrow v. Arnold*, 2006 WL 3289582, at *4 (Del. Ch. Oct. 31, 2006).

[34] *James v. United Medical LLC,*2017 WL 1224513, at *6 (Del. Super. Mar. 31, 2017), citing *Carrow*, 2006 WL 3289582, at *4 (citing *Taylor v. Jones*, 2002 WL 31926612, at *3 (Del. Ch. Dec. 17, 2002)).

total expression of their agreement.[35]  Conversely, "[i]f a written agreement is final and incomplete, it is a partially integrated contract."[36]

For purposes of a motion to dismiss for failure to state a claim under Superior Court Civil Rule 12(b)(6), all allegations in the complaint must be accepted as true. My review of the Amended Complaint, the 2014 Agreement, the 2017 Agreement, and the Separation Agreement leads me to conclude that the rights and responsibilities of OASD and Dr. Pfaff are governed by the 2017 Agreement as modified by the Separation Agreement.  Quite simply, the 2017 Agreement is a fully integrated agreement covering all aspects of the relationship between OASD and Dr. Pfaff.  The restrictive covenant in the 2014 Agreement did not survive the formation of the 2017 Agreement.

### The Integration Factors

The "Entire Agreement" clause of the 2017 Agreement specifically states  it "contains the **entire understanding and agreement** between the parties with respect to the subject matter hereof and **supercedes all prior agreements** and understandings between the parties with respect to such subject matter." (Emphasis added).  This creates a presumption that the 2017 Agreement is an integrated agreement covering

---

[35] *Taylor*, 2002 WL 31926612, at *3.

[36] *Id.*

15

Dr. Pfaff's employment relationship with OASD.[37]  An integration clause is not irrefutable, however, because the parties' intent always controls.[38]  A court must therefore consider the facts and circumstances surrounding the execution of the instrument to discern whether the contract is fully integrated or partially integrated. Factors relevant to that consideration include the following:[39]

1. The Parties' Intent

I conclude that the parties' intent was to make the 2017 Agreement the only agreement governing Dr. Pfaff's employment relationship with OASD.  The purpose of the 2017 Agreement is easily discernible from its title and language.  It is titled "Orthopaedic Associates of Southern Delaware, P.A., Physician Employment Agreement."  Its stated purpose was to employ Dr. Pfaff to provide medical services to patients of OASD.  The 2017 Agreement then went on to address every aspect of that relationship, including the termination of it.  Moreover, the 2017 Agreement makes no mention of the 2014 Agreement, suggesting that it was no longer of any relevance.

---

[37] *Addy v. Piedmonte,* 2009 707641, at *9 (Del. Ch. Mar. 18, 2009).

[38] *MicroStrategy Inc.,* v. *Acacia Research Corp.,* 2010 WL 5550455, at *13 (Del. Ch. Dec. 30, 2010).

[39] *James v. United Medical LLC*, 2017 WL 1224513, at *6 (Del. Super. Mar. 31, 2017).

16

2. The Language of the Contract Including any Integration Clause

The 2017 Agreement contains all of the terms applicable to a typical medical practice – physician employment relationship, including the term, conditions of employment, obligation of the physician, fees, the physician's compensation, new patient access, intellectual property, professional liability insurance, termination of agreement, indemnification upon termination, compliance with law, amendments, governing law, waiver, severability, further action, successors, non-assignability, confidentiality and non-disclosure, notices, physician general indemnification, headings, authority, entire agreement, retirement plan, survival and legal advice. Quite simply, the 2017 Agreement covered every aspect of Dr. Pfaff's employment relationship with OASD and added an "entire agreement" clause providing that the 2017 Agreement "contains the entire understanding and agreement between the parties with respect to the subject matter hereof and supersedes all prior agreements and understanding between the parties with respect to such subject matter." The subject matter of the 2014 and 2017 Agreements was Dr. Pfaff's employment as a physician by OASD. Thus, the parties provided that the 2017 Agreement was to be the sole agreement covering their relationship.

3. Whether the Contract was Carefully and Formally Drafted

The 2017 Agreement is comprehensive and detailed and was obviously drafted

by a person knowledgeable with the employment of physicians by medical practices. Thus, it certainly appears to be carefully and formally drafted.

4. The Time the Parties had to Consider the Contract's Terms

I do not know how long the parties had to consider the 2017 Agreement's terms, but it was obviously long enough to address every important matter in a medical practice-physician employment relationship.

5. Whether the Parties Bargained Over Specific Terms

I do not know if the parties bargained over the specific terms of 2017 Agreement. However, I would say that they did since a number of the important terms in the 2014 and 2017 Agreements were different, particularly the 2017 Agreement's lack of a non-compete clause, which was obviously important to both parties.

6. Whether the Contract Addressed Questions that Naturally Arise out of the Subject Matter

I conclude that the 2017 Agreement does. Indeed, it covers everything having to do with a medical practice-physician relationship.

Having considered all six factors, I conclude they all support my finding that the 2017 Agreement is a completely integrated document. Moreover, there are a number of other factors that support my conclusion that the 2017 Agreement is a fully integrated contract.

18

### The Stated Purpose of the Separation Agreement

The Separation Agreement provides that OASD and Dr. Pfaff were terminating Dr. Pfaff's employment relationship with OASD in "accordance with the terms" of the 2017 Agreement. There was no mention of the terms of the 2014 Agreement. If the 2014 Agreement had any continued relevance, then you would have expected the parties to refer to it. They did not.

### The 2017 and Separation Agreements

The 2014 Agreement prohibited Dr. Pfaff from competing with the OASD for one year. The 2017 Agreement and Separation Agreement did not prohibit Dr. Pfaff from competing with OASD at all. The only way to reconcile this conflict is to conclude that the 2014 Agreement did not survive the execution of the 2017 Agreement.

### The New Medical Practice

The 2014 Agreement reflected Dr. Pfaff's role as a shareholder and physician with OASD. The 2014 Agreement prohibited Dr. Pfaff from competing against OASD upon termination of the 2014 Agreement for a period of one year. Dr. Pfaff and OASD terminated the 2014 Agreement on February 28, 2017, and entered into the 2017 Agreement on March 1, 2017. The 2017 Agreement reflected Dr. Pfaff's role with OASD as a physician-employee and not a shareholder. The 2017

Agreement does not prohibit Dr. Pfaff from competing against OASD. The 2017 Agreement only prohibits Dr. Pfaff from hiring any former or current employees of OASD for a term of two years. The Separation Agreement relaxes this prohibition even further. It allows Dr. Pfaff to hire two employees of OASD when he starts his new medical practice contingent upon the two employees providing four weeks' notice to OASD. It is illogical for OASD to argue that Dr. Pfaff can hire two employees of OASD on short notice for a new medical practice but that he cannot open a new medical practice. There would be little to no point in addressing the hiring of the two physician assistants on short notice in the Separation Agreement if Dr. Pfaff could not open a medical practice for another nine months. You would have thought that if the parties believed that Dr. Pfaff was prohibited from opening a new medical practice for another nine months, then the parties would have discussed it at the same time they were discussing Dr. Pfaff's hiring of two OASD employees. They did not.

The Purpose and Timing of the Non-Compete Provision

The purpose of a non-compete covenant is to prohibit an employee from terminating his employment one day and becoming his employer's competitor the next day while all of his relationships with his employer's customers are intact. Thus, the purpose of a non-compete covenant is furthered by requiring the departing

20

employee to wait for a period of time before competing with his former employer. OASD and Dr. Pfaff terminated the 2014 Agreement on February 28, 2017. OASD and Dr. Pfaff entered into the 2017 Agreement on March 1, 2017. If you accept OASD's argument that the non-compete provision in the 2014 Agreement survives the 2017 Agreement, then the non-compete started to run on March 1, 2017. Thus, the one-year clock on the non-compete had started even though Dr. Pfaff was still working for OASD under the 2017 Agreement. Indeed, the non-compete could have run out if Dr. Pfaff had worked for OASD for a whole year. If the parties had wanted the non-compete to start when Dr. Pfaff ended his employment relationship with OASD – as would have been customary – then the parties would have said so. Their failure to do so defeats the purpose of the non-compete covenant and suggests that the parties did not intend for it to survive the execution of the 2017 Agreement. If OASD and Dr. Pfaff had understood and agreed otherwise, then it should have been discussed in the 2017 Agreement. It was not.

I viewed the parties' decision not to discuss in the 2017 Agreement and Separation Agreement the non-compete covenant in situations where you would have thought that they would have done so it if it was still applicable as a sign that it was no longer applicable and not as an indication that the 2017 Agreement was only partially integrated.

There is no evidence that suggests the 2017 Agreement is an incomplete recitation of the parties' desires. Even after drawing all reasonable inferences in favor of OASD and accepting the allegations in the Amended Complaint as true, there is no reasonable set of circumstances that suggest the 2014 Agreement survived the formation of the 2017 Agreement.[40] Dr. Pfaff's Motion to Dismiss Count I of the Amended Complaint is GRANTED.

## II. Alleged Breach of the Separation Agreement (Count III)

OASD alleges in the Amended Complaint that Dr. Pfaff breached the Separation Agreement by (1) sending to OASD patients the June letter which allegedly disparaged OASD, and (2) making oral and written statements which allegedly disparaged OASD.[41] The Separation Agreement provides as follows:

> 11. Non-disparagement. The parties agree not to make any oral or written communication to any person or entity which disparages, or has the effect of damaging the reputation of, or otherwise working in any way to the detriment of, the other party, except as required by local, state or federal law. In view of the difficulty of determining and calculating the amount of damages that may result from a violation of Section 10, each party agrees to pay the other $1,000 as liquidated

---

[40] OASD put great weight on the fact that under the Separation Agreement OASD had to provide Dr. Pfaff with financial reports for the period from January 1, 2014 through February 28, 2017. I did not for several reasons. One, this had nothing to do with the non-compete provision of the 2014 Agreement. Two, it suggested that OASD may have owed money to Dr. Pfaff for work he had done but had not been paid for. I took it as no more than that.

[41] I believe that Dr. Pfaff mistakenly denied sending the June letter but admitted that it disparaged OASD when he meant to admit sending it, but deny that it disparaged OASD.

22

damages and not as a penalty, for each and every violation of this Section.[42]

Black's Law Dictionary defines disparagement as a "false and injurious statement that discredits or detracts from the reputation of another's character, property, product, or business."[43]

## A. The June Letter

Dr. Pfaff argues that paragraph 36 of Count III of OASD's Amended Complaint fails in part because he did not disparage, harm, or act to the detriment of OASD in sending out his June letter. Dr. Pfaff argues that the June letter he sent to his prior patients is merely a notice letter or advertisement alerting his former patients of his new practice, apologizing for the disruption of their care, and offering them medical treatment. Therefore, according to Dr. Pfaff, under no set of facts could OASD make out a claim for disparagement which would entitle OASD to relief. OASD argues that the Separation Agreement prohibits the parties from making a broad range of negative and critical statements about each other. OASD argues that the June letter is critical of it and suggests that OASD prioritizes its business by putting its profits first and its patients second.

---

[42] Section 10 of the Separation Agreement refers to Dr. Pfaff's obligation not to obtain and/or use any of OASD's confidential information after he leaves it.

[43] *Black's Law Dictionary* 215 (3d ed. 1996).

After drawing all reasonable inferences in favor of OASD, I conclude that the June letter can be all of the things the Dr. Pfaff claims it is, but it can also be disparaging as OASD suggests. Dr. Pfaff wrote, "[i]n this day and age, medicine has become a business and in this instance the business of medicine obstructed me from continuing to treat you at my prior practice." Dr. Pfaff also wrote, "I am deeply sorry for the inconvenience and disruption; but, this was out of my control and affected me as well." It is reasonable and possible for the finder of fact to see this as OASD being more concerned about its business than treating its patients. This certainly provides a potential basis for recovery under a theory of disparagement for OASD. Since there is a possible basis for recovery which would entitle OASD to relief, Dr. Pfaff's allegation that paragraph 36 of Count III of the Amended Complaint must be dismissed for failure to state a claim is DENIED.

**B. Email**

Dr. Pfaff argues that paragraph 37 of Count III of the Amended Complaint must be dismissed in part as conclusory. OASD argues that Dr. Pfaff disparaged it in a June 2, 2017, email to a colleague. The email states:

"I established the "Lewes Spine Center, LLC"... my plan ... get back in the ring and get my title back."

"Oh, Did I say crush OASD."

"I'm sure you have been seeing many of my prior patients so I wanted

24

to update you. Today, I am sending out 1,100 letters to my prior patients. I will start seeing patients this month in a satellite office in Georgetown. I am bidding on an office space in Kings Row, Lewes."

Even after accepting all allegations in the Amended Complaint as true and drawing all reasonable inferences in favor of OASD, I conclude that the e-mail does not disparage OASD. All the email does is boast what Dr. Pfaff perceives his talents to be and his desire to have a more successful business than OASD. That is not disparagement. Dr. Pfaff's allegation that paragraph 37 of Count III of the Amended Complaint must be dismissed for failure to state a claim upon which relief may be granted as it relates to the June 2, 2017, email is GRANTED.

### C. Other Oral and Written Statements

Dr. Pfaff argues that paragraph 37 of Count III of the Amended Complaint must be dismissed in part as conclusory. OASD argues that Dr. Pfaff made oral or written statements that were disparaging and damaging to OASD, or detrimental to OASD. OASD does not state what those oral or written statements were other than the June 2, 2017, email, which I discussed above. Without more, there is simply no conceivable way for OASD to recover due to the conclusory nature of this allegation. Dr. Pfaff's allegation that paragraph 37 of Count III of the Amended Complaint must be dismissed for failure to state a claim upon which relief may be granted is GRANTED.

# CONCLUSION

Dr. Pfaff's Motion to Dismiss OASD's Amended Complaint is GRANTED in part and DENIED in part as follows:

Dr. Pfaff's Motion to Dismiss Count I of OASD's Amended Complaint is GRANTED.

Dr. Pfaff's Motion to Dismiss Paragraph 36 of Count III of OASD's Amended Complaint is DENIED.

Dr. Pfaff's Motion to Dismiss Paragraph 37 of Count III of OASD's Amended Complaint as it relates to the June 2, 2017, email and "other oral and written statements" is GRANTED.

Very truly yours,

*/s/ E. Scott Bradley*

E. Scott Bradley

cc:     Prothonotary